**UNITED HOSPITAL SERVICES, INC.,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

No. IP 72–C–443.

United States District Court,
S. D. Indiana,
Indianapolis Division.

July 18, 1974.

G. Daniel Kelley, Jr., Indianapolis, Ind., for plaintiff.

John A. Flanagan, Washington, D. C., and Stanley B. Miller, U. S. Atty., Indianapolis, Ind., for the Government.

## MEMORANDUM OF DECISION

DILLIN, District Judge.

This cause comes before the Court for trial, both sides having agreed to waive trial by jury and proceed on stipulated facts. Plaintiff, United Hospital Services, Inc. (hereinafter "UHS"), and defendant, United States of America, have each submitted proposed findings of fact and conclusions of law: The question presented for this Court's decision is whether UHS, incorporated "to establish, maintain and operate hospital laundry facilities" for certain tax-exempt hospitals, should be allowed a refund on its income taxes for fiscal year ending August 28, 1971, because it qualifies as a charitable organization under Section 501(c)(3) of the Internal Revenue Code of 1954.

In 1963, five public or nonprofit, private hospitals located at Indianapolis, Indiana, and having their own separate laundry facilities, undertook feasibility studies of a centralized laundry service. (Stip. 1 and 4.) These studies concluded that a centralized laundry service could save the hospitals $1.1 million in capital construction costs and $159,000 in operational costs per year for a total savings of about $300,000 per year. (Stip. 6.) The studies further concluded that each hospital had to have an active part in managerial control of a centralized laundry facility for reasons of hospital operation and reduction of costs. It was also shown that no commercial laundry in the area was able or willing to provide specialized laundry service to the hospitals. (Stip. 5.)

UHS was incorporated on March 23, 1964:

"a. To establish, maintain and operate hospital laundry facilities for these public hospitals and non-profit private hospitals or similar health facilities organized and operated exclusively for religious, charitable, scientific or educational purposes which become members of this corporation;

b. To develop electronic computer data processing programs and services . . . ;

c. To provide facilities for the operation and maintenance of a community blood bank and other community health activities;

d. To provide facilities for the operation and housing of medical records . . . . ."

So far, UHS has only tried to meet purpose "a," operating hospital laundry facilities. Only public or nonprofit, private hospitals can become members or use the facilities of UHS. (Stip. 7.) Only these hospital members may vote for and elect members to the Board of Directors of UHS. (Stip. 9.) The President of UHS is also the administrator or assistant administrator of one of the hospital members. (Stip. 10.) UHS employs approximately 130 people. Besides a laundry manager, office manager-bookkeeper and a supervisor, UHS does not employ anyone in a managerial capacity. (Stip. 11.) Managerial policies and decisions are formulated by five standing committees staffed and controlled by employees of the hospital members. These employee committee members and the President of UHS are compensated only by their individual member hospital employer, not UHS (Stip. 12.)

UHS arranged for a bank loan of $1.8 million, constructed laundry facilities, and commenced operations on November 6, 1966. (Stip. 7.) UHS performs laundry and related services, including purchase of standardized linen supplies, for the hospital members. (Stip. 19.) The net result of UHS's activities has been an increase in the usable life of laundered items and available space in member hositals as well as a decrease in the cost of laundry processing and linen supply. (Stip. 21.) UHS has never made a distribution in money or property, nor have any net earnings inured to the benefit of any member or individual. (Stip. 25 and 30.) Similarly, UHS has never offered its services to anyone or any business other than its hospital members. (Stip. 26.) Charges for services performed by UHS do not exceed the costs of operations, capital additions and debt service. (Stip. 26.) The government concedes that UHS is operated exclusively for the purpose of providing laundry services for its hospital members. (Stip. 26.)

The Internal Revenue Service denied the application of UHS for a determination that it was a tax-exempt charitable organization on October 29, 1968. UHS filed an amended corporate income tax return on February 10, 1972, for fiscal year ending August 28, 1971, and paid $462.17 in income taxes reported due on the return. On the same day UHS filed a claim for a refund of the entire amount of corporate income taxes paid, claiming that it was a charitable organization exempt from tax under Section 501. The District Director denied the claim for refund on July 12, 1972, and UHS filed this action on September 21, 1972.

Section 501 exempts from taxation any corporation "organized and operated exclusively for . . . charitable . . purposes, . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual. . . ." Int.Rev.Code of 1954, § 501(a) and (c)(3). In order to qualify for this exemption, the Treasury Regulations require an organization to "be both organized and operated exclusively for one or more of the purposes specified in such section." Treas.Reg. § 1.501(c)(3)–1(a) (1). The federal government does not contest the exclusive organization and

operation of UHS for its stated purpose of establishing and maintaining a central laundry facility for tax-exempt hospitals. The government does challenge, however, whether UHS's stated purpose is a "charitable" purpose qualifying for exemption under Section 501.

The Treasury Regulations offer few guidelines in analyzing what constitutes a "charitable" purpose:

> "The term 'charitable' is used in section 501(c)(3) in its generally accepted legal sense and is, therefore, not to be construed as limited by the separate enumeration in section 501(c)(3) of other tax-exempt purposes which may fall within the broad outlines of 'charity' as developed by judicial decisions. Such term includes: Relief of the poor and distressed or of the underprivileged; advancement of religion; advancement of education or science; erection or maintenance of public buildings, monuments, or works; lessening of the burdens of Government; and promotion of social welfare by organizations designed to accomplish any of the above purposes . . . ." Treas.Reg. § 1.501(c)(3)–1(d)(2).

■■■ Usually, provisions allowing for exemptions from taxation are strictly construed against those claiming such exemptions. Conference of Major Religious Superiors of Women, Inc. v. District of Columbia, 121 U.S.App.D.C. 171, 348 F.2d 783 (1965). But in cases involving charitable purposes, provisions giving tax exemptions are liberally construed. American Institute for Economic Research v. United States, 302 F.2d 934, 157 Ct.Cl. 548 (1962), cert. den. 372 U.S. 976, 83 S.Ct. 1109, 10 L.Ed.2d 141, rehearing den. 373 U.S. 954, 83 S.Ct. 1677, 10 L.Ed.2d 708 (1963); Harrison v. Barker Annuity Fund, 90 F.2d 286 (7 Cir. 1937). Ambiguity of these provisions has been traditionally resolved against taxation. C. F. Mueller Co. v. Commissioners, 190 F.2d 120 (3 Cir. 1951).

■■■ In determining the tax status of an organization, courts look to the pre-dominant purpose for forming the organization and its manner of operations. Passaic United Hebrew Burial Ass'n v. United States, 216 F.Supp. 500 (D.N.J. 1963). The organization's right to an exemption depends largely upon how its operations affect the public. People's Educational Camp Society, Inc. v. Commissioner, 331 F.2d 923 (2 Cir.), cert. den. 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed. 2d 45 (1964). The organization must exclusively perform essential public services. Horace Heidt Foundation v. United States, 170 F.Supp. 634, 145 Ct.Cl. 322 (1959). The fact that an organization produces income to retire its indebtedness does not disqualify it from being tax-exempt. Shiffman v. Commissioner, 32 T.C. 1073 (1959).

The purposes for forming UHS have already been detailed above. Due to the specialized needs of hospital laundry (see Stip. 2, 15, 20, 21 and 23), necessity of direct hospital managerial control, inability and unwillingness of commercial laundries, and possibility of substantial savings, the group of tax-exempt hospitals incorporated UHS under the Indiana General Not-for-Profit Corporation Act, July 1, 1935, ch. 157, § 1, [1935], Burns Ind.Stat.Ann. § 25–507 et seq. (repealed 1971) IC 1971, 23–7–1.1–1 et seq.

UHS's manner of operations has also been set out above. It is staffed and controlled by its tax-exempt members who donate their employees' services in the management of UHS. Tax-exempt members alone can and have used UHS's services. UHS charges its members only enough to meet the costs of operations, capital additions and debt service. Both parties have stipulated that UHS's operations have and are providing "the best and most inexpensive centralized laundry facility . . . for its tax-exempt Hospital Members." (Stip. 27.)

No one doubts the enormous, beneficial effect the hospital members themselves have on the public. All of the hospital members existing before UHS had their own separate laundry and linen facilities. (Stip. 1.) It is impossible for a

780

hospital to discharge its charitable purposes without a laundry and linen service. (Stip. 29.) Although important, hospital laundry service is also costly. (Stip. 2.) UHS processes approximately 13 million pounds of laundry a year (Stip. 7), which feasibility studies showed could not be handled by commercial laundry. (Stip. 5.) The projected savings of $300,000 a year inures to the sole benefit of hospital members and not any private individual. (Stip. 30.) This savings benefit promotes the public health by lessening general hospital expenses, allowing more money for further services and making available space allocated to laundries.

■ The above findings compel this Court to conclude that UHS is a charitable organization under Section 501(c)(3), and therefore exempt from taxation under Section 501(a). The Congressional purpose behind enacting Section 502 (denying exempt status to an organization primarily engaged in business although directing all its net income to an exempt organization) and Section 511 (imposing a tax on the unrelated business income of otherwise exempt organizations) of the Code in 1950 "was to prevent organizations with tax exempt status from competing unfairly with ordinary, taxed business entities." People's Educational Camp Society, Inc., *supra*, 331 F.2d at 935. This is not the case here.

The evidence discloses that the sanitary and quality standards set by the Hospital Members have required UHS to establish, *inter alia*, a positive-negative air-flow system in its laundry so that the air from the soiled laundry areas cannot reach the clean laundry facilities, to establish bacteria control checks, to use specially designed stainless steel trucks which are steam cleaned between usages, to steam clean ward carts between usages for soiled and clean linen, and to count and park these standardized carts for in-hospital use so that a cart loaded with the requisite amount of clean linen may be delivered directly to a ward in a particular hospital for direct

distribution to patients in the ward area. (Stip. 15, 20, 23.) These and other specialized services as set out in such stipulations clearly distinguish the UHS laundry service from ordinary, general or commercial laundry service as a matter of fact. Moreover, a study revealed no commercial laundry in the area able or willing to provide the required laundry service (Stip. 5), so the competition factor does not exist.

The government argues that the addition of what is now Section 501(e) in 1968 clearly shows the intent of Congress to exclude hospital laundry service organizations from being treated as charitable organizations under Section 501(c)(3). Section 501(e) provides that cooperative hospital service organizations will qualify for exemption if they perform one of the following services: data processing, purchasing, warehousing, billing and collection, food, industrial engineering, laboratory, printing, communications, record center and personnel. There have been no interpretive regulations promulgated for this subsection. Congressional reports are quoted to show that the omission of "ordinary, general and commercial" laundry services from the list was intentional.

■ The Court believes it to be true that the Congress intentionally omitted ordinary, general and commercial laundry services from the blanket exemption granted to hospital cooperatives in Section 501(e). It does not follow, however, that the addition of Section 501(e) excludes UHS from consideration as a Section 501(c)(3) charitable organization on its own merits. UHS has consistently maintained in its claim for refund and in its briefs that Section 501(c)(3) applies. The question of whether it is organized and operated for an exempt purpose is a question of fact for this Court to decide. Underwriters' Laboratories v. C. I. R., 135 F.2d 371 (7 Cir. 1943).

■ UHS was incorporated and doing business some years before Section 501(e) was adopted in 1968. It was

either a charitable organization before 1968, under then existing law, or it was not. The Court holds that it was, for reasons above and hereafter set out. The clearly expressed Congressional purpose behind the enactment of Section 501(e) was to enlarge the category of charitable organizations under Section 501(c)(3) to include certain cooperative hospital service organizations, and not to narrow or restrict the reach of Section 501(c)(3). The latter section was not modified by the legislation in any way, and the legislation does not purport to take away charitable status from a corporation which had already acquired it. Insofar as this case is concerned, therefore, Section 501(e) is irrelevant.

As above noted, a charitable institution is conceded by the regulations to be any institution which may fall within the broad outlines of "charity" as developed by judicial decisions. The Supreme Court of the United States has said " 'A charitable use, where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well doing and well being of social man.' " (cit. om.) Ould v. Washington Hospital for Foundlings, 95 U.S. 330, 24 L.Ed. 450 (1877).

These "broad outlines of charity as developed by judicial decisions" encompass the activities of UHS. As previously developed, UHS represents a consolidation of laundry services and facilities previously done by each Hospital Member for itself (all of which are charitable tax-exempt hospitals). UHS has charged such hospitals only an amount necessary to cover operational expenses, debt retirement, and new equipment purchases. There has been no profit (as the term is normally used) in the formation of UHS or in the charges made by UHS. There has been no profit made from offering the services to the other businesses or the public. UHS has not been competing with private, for-profit laundries. It is true that its articles of incorporation allow it to render services which it has not pursued, but those services also represent essential hospital functions, and would necessarily, under the articles, be performed in the same manner.

This case is completely analogous to Hospital Bureau of Standards and Supplies, Inc. v. United States, 158 F.Supp. 560, 141 Ct.Cl. 91 (1958). There, as here, a not-for-profit hospital service organization brought an action to recover federal income taxes paid. The organization acted as a purchasing agent for members who were all not-for-profit, charitable hospitals. The directors of the organization were all from member hospitals' staffs. The organization included research and standardization departments and billed members directly for services performed. The organization issued no capital stock, paid no interest or dividends to members, and had only one officer receiving a salary. Additionally, unlike UHS, excesses on charges over cost were credited directly to member accounts. The Court in *Hospital Bureau* held that the organization was incorporated to provide a specialized service, that the service was a necessary and indispensable part of member hospitals' operations, and that the organization's activities resulted in beneficial cost savings to its hospital members. The Court went on to hold it to be a charitable organization and ordered recovery of taxes paid by it.

The government has also cited certain Treasury Regulations, and particularly 26 C.F.R. § 1.502–1, in support of its position. That regulation reads as follows:

"§ 1.502–1 Feeder organizations. . . .

(b) If a subsidiary organization of a tax-exempt organization would itself be exempt on the ground that its activities are an integral part of the exempt activities of the parent organization, its exemption will not be lost because, as a matter of accounting between the organizations, the subsidiary derives a profit from its dealings with its parent organization, for example, a subsidiary organization which is operated for the sole purpose of furnishing electric power used by its parent organization, a tax-exempt education-

782

al organization, in carrying on its education activities. However, the subsidiary organization is not exempt from tax if it is operated for the primary purpose of carrying on a trade or business which would be an unrelated trade or business (that is, unrelated to exempt activities) if regularly carried on by the parent organization. For example, if a subsidiary organization is operated primarily for the purpose of furnishing electric power to consumers other than its parent organization (and the parent's tax-exempt subsidiary organizations), it is not exempt since such business would be an unrelated trade or business if regularly carried on by the parent organization. *Similarly, if the organization is owned by several unrelated exempt organizations, and is operated for the purpose of furnishing electric power to each of them, it is not exempt since such business would be an unrelated trade or business if regularly carried on by any one of the tax-exempt organizations. . . ."* (Court's emphasis.)

Charitably put (no pun intended), the Court has difficulty in finding any basis in the statute, 26 U.S.C. § 502, for the underlined portion of the regulation. The statute provides quite simply that "[a]n organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under section 501 on the ground that all of its profits are payable to one or more organizations exempt under section 501 from taxation." What does this have to do with two or more such organizations setting up a not-for-profit corporation, wholly controlled by them, and not serving the public, in order to effect economies in their own charitable operations? The Court in *Hospital Bureau, supra,* gave no effect to the regulation, nor does this Court.

It is interesting to note that another agency of the federal government, the National Labor Relations Board, has found that UHS is an integral part of the exempt hospitals which caused it to be incorporated, has no existence independently of such hospitals, and thus shares their statutory exemption so as not to be an employer within the meaning of the Labor Management Relations Act. United Hospital Services, Inc., 69 LRRM 1046 (1968). Likewise of interest are the decision of the Appellate Court of Indiana, holding a hospital service corporation exempt from taxes under the Indiana Employment Security Act, Mutual Hospital Service, Inc. v. Indiana Emp. Sec. Bd., 138 Ind.App. 333, 213 N.E.2d 912 (1966), and the decision of the Supreme Court of Massachusetts holding that a not-for-profit laundry corporation precisely like UHS is a charitable corporation and thus exempt from realty and personalty tax. Children's Hospital Medical Center v. Board of Assessors, 353 Mass. 35, 227 N.E.2d 908 (1967). The government has cited no case to the contrary, and the Court has found none.

Judgment on the foregoing findings and conclusions will therefore be entered for the plaintiff. The parties are directed to make the necessary computations and submit a judgment entry as provided in Stipulation 40.