**NORTHERN CALIFORNIA CENTRAL SERVICES, INC.**

v.

**The UNITED STATES.**

No. 352–77.

United States Court of Claims.

Jan. 24, 1979.

Robert S. Bromberg, Washington, D. C., attorney of record for plaintiff. Baker, Hostetler & Patterson, Washington, D. C., Norman I. Book and Carr, McClellan, Ingersoll, Thompson & Horn, Burlingame, Cal., of counsel.

James L. Malone, III, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and SMITH, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

Plaintiff Northern California Central Services (NCCS), a shared laundry service organization, seeks a declaratory judgment under 26 U.S.C. § 7428(a)(1) that it is a "charitable organization" as defined in § 501(c)(3) of the Internal Revenue Code, and thus entitled to an exemption from federal income tax under § 501(a).

Northern California Central Services is a California nonprofit corporation organization to provide laundry services to nonprofit hospitals. It was founded in order to maintain the sanitary standards for hospital laundry and linen required by the Joint Committee on Accreditation of Hospitals, to improve efficiency and flexibility in the face of demand peaks, and to effect economies of scale. Individual commercial laundries had not been able to accomplish these goals.

The by-laws of NCCS provide that administrative officers of capital member hospitals shall exercise control over the organization's management. Member hospitals must be qualified as "not-for-profit" hospitals under § 501(c), and may consist of two types—capital members (who have contributed capital to the organization) and service members (who purchase services from NCCS). At present, all seven member hospitals qualify for income tax exemption under § 501(c)(3), although at the time of filing for an exemption with the IRS, one hospital qualified only under § 501(c)(4).

Plaintiff's 1976 application for an exemption was denied by the IRS, which ruled that the organization was "neither organized nor operated exclusively for one or

more exempt purposes as specified in section 501(c)(3) of the Code." Plaintiff filed a protest which was denied. Having exhausted all administrative remedies as the statute requires, NCCS filed a § 7428 declaratory judgment action in this court, to determine its status under § 501.

■ Section 7428 was added to the Code by Pub.L.No.94–455, 90 Stat. 1717 (Act of October 4, 1976). It prescribes an exception to the usual rule that we do not have jurisdiction of declaratory judgment actions. *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). Defendant does not attack our jurisdiction in this case, but in part its argument disregards the fact that jurisdiction to enter declaratory judgments is equitable in nature. *United States v. King, supra.*

There are three sub-issues to be considered in determining plaintiff's tax status: (1) does the absence of shared laundry services from the exclusive list of cooperative organizations entitled to an exemption under § 501(e) bar NCCS's exemption under § 501(c)(3); (2) does plaintiff's structure and activities entitle it to be considered a § 501(c)(3) organization; and (3) do the "feeder provisions" of § 502(a) deny NCCS an exemption?

The Internal Revenue Code, § 501(a), allows federal income tax exemptions for organizations described in §§ 501(c) or (d), unless restrictions under §§ 502 or 503 pose barriers. Plaintiff contends that it is a charitable organization as described in § 501(c)(3). That section provides an exemption for:

> Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, * * * purposes, * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation * * *.

■ Defendant argues that plaintiff must qualify, if at all, under § 501(e), rather than under § 501(c). Section 501(e) states:

> (e) Cooperative hospital, service organizations

> For purposes of this title, an organization shall be treated as an organization organized and operated exclusively for charitable purposes, if—

> (1) such organization is organized and operated solely—

>> (A) to perform, on a centralized basis, one or more of the following services which, if performed on its own behalf by a hospital which is an organization described in subsection (c)(3) and exempt from taxation under subsection (a), would constitute activities in exercising or performing the purpose or function constituting the basis for its exemption: data processing, purchasing, warehousing, billing and collection, food, clinical, industrial engineering, laboratory, printing, communications, record center, and personnel (including selection, testing, training, and education of personnel) * * *

Defendant's brief details legislative history indicating that Congress had long considered granting exemptions to shared laundry services under § 501(e) and eventually decided against such an action. This, counsel for the government concludes, demonstrates that Congress deliberately foreclosed opportunities for shared laundry services to obtain an exemption under any other provision of § 501, including § 501(c)(3). Defendant cites a Revenue Ruling, Rev. Rule 69–160, 1969–1 Cum.Bull. 147, which comes to the same conclusion as defendant's counsel here, but must fail if counsel's argument fails, so we give it no further separate consideration.

It is, we suppose, arguable that Congress preempted the subject of hospital laundries in passing § 501(e), and by not mentioning them with other hospital services it did mention, carved them out of § 501(c)(3). Our consideration of the legislative history of § 501(e) does not lead us to this sweeping conclusion. Section 501(e) provides an exemption for some cooperative organizations

which adhere to the requirements stated therein. We agree with plaintiff that the intent of Congress in passing § 501(e) was to broaden the class of organizations entitled to an exemption as a "charitable organization," not to narrow it, and that, as to laundry services, it left the law as it was.

In considering § 501(e)'s history, it is necessary to examine not only what Congress did do in 1968 when it added that provision, but what it did not do. Proponents of the amendment argued that rigidities in the law at that time, particularly the "feeder" provision of § 502, to be discussed below, discouraged the formation of hospital service organizations. See 114 Cong.Rec. 8112 (1968) (remarks of Senator Tydings). But nowhere in the legislative history of § 501(e) is there a reference to an intent to amend § 501(c)(3), or to alter the then-present interpretation. Indeed the House Report specifically stated that § 501(e) was to be an *addition* to § 501. H.Rep.No.1533, 90th Cong., 2d Sess. 43 (1968), U.S.Code Cong. & Admin.News 1968, p. 2341.

This court had decided *Hospital Bureau of Standards and Supplies v. United States*, 158 F.Supp. 560, 141 Ct.Cl. 91 (1958), years before the adoption of § 501(e). In *Hospital Bureau of Standards*, we held that a cooperative hospital purchasing organization serving several non-profit hospitals was exempt from income tax under the predecessor of § 501(c)(3). The Senate Finance Committee, in 1967, mentioned that decision as the "leading case," when it attempted to add a provision to the Social Security Amendments of 1967, Pub.L.No. 90–248, 81 Stat. 821, stating that such organizations were exempt from income tax. The Committee reasoned that such a provision was necessary because despite the decision in *Hospital Bureau of Standards*, some hospitals were reluctant to form shared service organizations due to the resistance of the IRS exemplified in its rulings and regulations denying exemptions. S.Rep.No.744, 90th Cong., 1st Sess. 200–01 (1968). The Senate's suggestion was not accepted in the final version of the 1967 bill. H.Conf.Rep. No.1030, 90th Cong., 1st Sess. 41 (1968), U.S.Code Cong. & Admin.News 1967, p. 2835.

When Congress passed the present § 501(e) in 1968, though, it did exclude shared laundry services from its list of exempt service organizations, but made no attempt to alter *Hospital Bureau of Standards'* interpretation of § 501(c)(3) or that section's applicability to shared laundry services, despite the fact, above mentioned, that the Congressmen were aware of *Hospital Bureau of Standards*, and its holding. Thus, the interpretation of § 501(c)(3) as rendered by this court in *Hospital Bureau of Standards* remains intact. The provision we interpreted was left untouched, while other law was written to take care of other decisions by the IRS with which Congress was dissatisfied.

We find support for these conclusions from federal courts which have examined the same issue. *Metropolitan Detroit Area Hospital v. Commissioner*, 445 F.Supp. 857 (E.D.Mich.1978) (on appeal to the Sixth Circuit); *Hospital Central Services Ass'n v. United States*, 77–2 U.S.Tax Cas. ¶ 9601 (W.D.Wash.1977) (on appeal to the Ninth Circuit); and *United Hospital Services, Inc. v. United States*, 384 F.Supp. 776 (S.D.Ind. 1974).

We may take judicial notice that hospital laundry service is a sensitive matter. If not perfectly performed, it may be the means of spreading the diseases that hospitals exist to contain or cure. With consistency, Congress may have wished not to encourage cooperative hospital laundries by new tax exemptions, to which commercial laundries made vehement objections, yet to leave such laundries free to obtain from the courts the exemptions that existing law might afford them. Congress appears to have viewed the matter as controversial and one as to which it was insufficiently informed. What could have been more rational than to leave such a matter to the courts? Had Congress desired to curtail existing exemptions, knowing the position this court's decision had accorded them, it hardly could have failed to write law amending § 501(c)(3). Thus the totality of

its actions and omissions does not add up to a policy decision to place hospital laundries in a position of inferior status under the law, across the board, or except as expressly provided as to § 501(e).

Since we hold the inability of a shared hospital service organization to fit into the § 501(e) pigeonhole does not automatically bar an exemption, we now look to see if taxpayer satisfies the general charitable exemption requirements of § 501(c)(3).

■ When an organization participates in an enterprise which is generally considered one of a commercial nature, it can qualify as a charitable organization under § 501(c)(3), only if the *primary* purpose of its activities is charitable. A court must determine "whether the business activities of the taxpayer are incidental to its charitable objectives or whether, in fact, the converse is true." *Scripture Press Foundation v. United States*, 285 F.2d 800, 805, 152 Ct.Cl. 463, 471 (1961), *cert. denied*, 368 U.S. 985, 82 S.Ct. 597, 7 L.Ed.2d 523 (1962).

■ We have little difficulty in determining that this operation's primary purpose is charitable. Plaintiff provides its member organizations with laundry services supposedly more efficiently, more inexpensively, and under more sanitary conditions than the services proffered by other commercial laundries. Whether these advantages are really obtained is of course for the hospitals, not for this court to decide. Laundry services are essential to the operation of a hospital. This court, in *Hospital Bureau of Standards, supra*, and three other federal courts have consistently held that an organization providing shared services for tax-exempt hospitals is a "charitable organization" within the meaning of § 501(c)(3). *See Metropolitan Detroit Area Hospital v. Commissioner, supra; Hospital Central Services Ass'n v. United States, supra*, and *United Hospital Services, Inc. v. United States, supra*.

Defendant argues that Congress' refusal specifically to mention shared laundry services in its list of shared services entitled to an exemption under § 501(e) indicates that such a service was not deemed to have an "important public purpose," and thus should not be entitled to an exemption under § 501(c)(3). As discussed above, we have determined, as have other federal courts, that Congress did not intend to limit entitlement to an exemption under § 501 when it added § 501(e)'s "safe harbor" rule for cooperative service organizations. The mere exclusion of laundry services from § 501(e)'s list, an exclusion made to avoid present controversy, is not as we have shown a definitive judgment by Congress that shared laundry services do not serve a public purpose. Indeed, statements of today's health officials indicate the contrary. Recently, Secretary Califano indicated plans to revise Medicare regulations "to encourage non-profit hospitals to pool their resources and to share services, from laundry and billing services to medical programs." HEW News, April 12, 1978, at 8. With all respect to defendant's able counsel who is obliged to defend the IRS position, this appears to be an instance of administrative policies working at cross purposes to frustrate one another.

■ Defendant also argues that NCCS was not designed as a "charitable organization" because its Articles of Incorporation and By-Laws allow participation not only by hospitals qualifying for exempt status under § 501(c)(3) (organizations operated exclusively for charitable purposes) but by hospitals qualifying for tax exemptions under § 501(c)(4) (nonprofit organizations established for "the promotion of social welfare.") According to defendant, § 501(c)(4) organizations are involved in a scope of activities broader than those envisioned in the "general law of charity" and applying to § 501(c)(3) organizations. The primary difference between the two, defendant notes, is that organizations qualifying under § 501(c)(3) are restricted from substantial involvement in attempts to influence legislation, whereas § 501(c)(4) organizations have greater flexibility in that field. They are, according to that section, "Civic leagues or organizations * * *" meeting certain specifications. One member hospital of NCCS, the French Hospital, had qual-

ified for exemption status only under § 501(c)(4) at the time NCCS had applied for an exemption. How French Hospital came under that rubric, the record does not inform us. Defendant does not say French Hospital has ever done anything to influence legislation. French Hospital has been recently granted an exemption under § 501(c)(3). Defendant argues that the present status of French Hospital is irrelevant, that an exemption under § 501(c)(3) requires a "guarantee" (via provisions in the organization's articles of incorporation and by-laws) that member organizations are presently and will always be exempt under § 501(c)(3), and that, therefore, NCCS can never be given an exemption.

We reject that argument. First, provision of services to a § 501(c)(4) hospital, whatever that may be, does not automatically categorize the service provider as an organization which is not organized and operated "exclusively for charity" as required by § 501(c)(3). The test of "exclusivity" has been defined by Treasury Regulations and case law to mean that a *substantial* nonexempt purpose or activity will disqualify the organization's exempt status, but insubstantial nonexempt activities do not destroy the exemption. *Better Business Bureau of Washington, D. C., Inc. v. United States*, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67 (1945); *St. Louis Union Trust Co. v. United States*, 374 F.2d 427, 431 (8th Cir. 1967); Treas.Reg. § 1.501(c)(3)–(1) (c)(1). Even if a hospital qualifying under § 501(c)(4) can become a member of NCCS, if it is a hospital it is unlikely that a substantial part of its activity would be for a noncharitable purpose, as defined by the general law of charity. It is not likely that furnishing laundry service to a § 501(c)(4) hospital, whatever that is, will aid or abet the influencing of legislation. Presumably in becoming a § 501(c)(3) organization French Hospital has now given up its right to influence legislation.

The test of a charitable organization generally examines whether that organization is providing a public benefit, rather than a private one, and as a legal definition includes much more than the popular conception of relief to the needy. *See Green v. Connally*, 330 F.Supp. 1150, 1157 (D.D.C. 1971) *aff'd per curiam sub nom. Coit v. Green*, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971); Restatement (Second) of Trusts, § 368 (1958); B. Hopkins & J. Myers, The Law of Tax Exempt Organizations 140 (1975). The provision of health care has generally been considered to be a charitable purpose. Restatement (Second) of Trusts § 368 (1958); *Eastern Kentucky Welfare Rights Organization v. Schultz*, 165 U.S. App.D.C. 239, 506 F.2d 1278, 1287, *rev'd on other grounds*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Thus, since hospital services (especially those of nonprofit hospitals, which are the only acceptable members of NCCS) are generally concerned with the provision of health care for the community and other activities of the hospital are incidental, inclusion of a § 501(c)(4) hospital as a member of NCCS will not destroy its substantially "charitable purpose," without more showing of the nature of the supposititious evil than defendant has made. In this case we note that French Hospital provided only 10 percent of the total income of NCCS, so even if all of its activities were deemed "noncharitable," NCCS would still be carrying on activities substantially charitable in nature.

Thus, it is clear that the organization and operation of NCCS identifies it as a charitable organization. Laundry service is an integral part of the member hospitals' activities. All the members are nonprofit tax-exempt organizations. Since the subsidiary enterprise generally takes on the tax status of its controlling "parent," *see Trustees of the Graceland Cemetery Improvement Fund v. United States*, 515 F.2d 763, 771, 206 Ct.Cl. 609, 623 (1975); *Hospital Bureau of Standards*, 141 Ct.Cl. at 94, 158 F.Supp. at 563, the laundry service organization is a charitable, tax-exempt, § 501(c)(3) organization. In sum, the following factors bolster NCCS's § 501(c)(3) status: (1) it provides crucial services to tax-exempt organizations; (2) it has not enjoyed any profits since the year of its incorporation in 1966; (3) it is controlled by

the tax-exempt members for their exclusive use. *See Metropolitan Detroit Area Hospital v. United States, supra,* at 862.

■ If defendant's argument had had any substance prior to the acquisition of § 501(c)(3) status by French Hospital, we could have taken care of the matter under our equitable powers by conditioning our declaration of exemption on abstention by French Hospital from future efforts to influence legislation. It was even then an inequitable argument.

The government's final argument is that NCCS is not entitled to an exemption because of the limitations of the so-called "feeder provisions" imposed by § 502(a). We disagree.

Section 502(a) provides that:

§ 502. Feeder organizations

(a) General rule—

An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt from taxation under section 501 on the ground that all of its profits are payable to one or more organizations exempt from taxation under section 501.

Defendant's primary resource is Treas. Reg. § 1.502–1(b) which clarifies the definition of a "feeder organization" :

If a subsidiary organization of a tax-exempt organization would itself be exempt on the ground that its activities are an integral part of the exempt activities of the parent organization, its exemption will not be lost because, as a matter of accounting between the two organizations, the subsidiary derives a profit from its dealings with its parent organization, for example, a subsidiary organization which is operated for the sole purpose of furnishing electric power used by its parent organization, a tax-exempt educational organization, in carrying on its educational activities. However, the subsidiary organization is not exempt from tax if it is operated for the primary purpose of carrying on a trade or business which would be an unrelated trade or business (that is, unrelated to exempt activities) if

regularly carried on by the parent organization. * * *

Defendant especially emphasizes the example contained in that regulation:

* * * For example, if a subsidiary organization is operated primarily for the purpose of furnishing electric power to consumers other than its parent organization (and the parent's tax-exempt subsidiary organizations), it is not exempt since such business would be an unrelated trade or business if regularly carried on by the parent organization. Similarly, if the organization is owned by several unrelated exempt organizations, and is operated for the purpose of furnishing electric power to each of them, it is not exempt since such business would be an unrelated trade or business if regularly carried on by any one of the tax-exempt organizations. * * *

This court in *Hospital Bureau of Standards* dealt with the predecessors of § 502(a) and Treas.Reg. § 1.502–1(b). The present § 502(a) differs from its predecessor only in its reference to statutory sections; the past and present regulations and the example given are identical. In *Hospital Bureau of Standards,* we specifically rejected the applicability of Treas.Reg. § 1.502–1(b) to an organization composed of member hospitals whose services were available only to those members. We ruled that the predecessor to Treas.Reg. § 1.502–1(b)(2) did not accurately interpret the intent of Congress. The raison d'etre for § 502 and its predecessor was to prevent the type of abuse exemplified in *C. F. Mueller Co. v. Commissioner,* 190 F.2d 120 (3d Cir. 1951). In that case, profits from Mueller's macaroni company were held to be exempt from income tax because that company's certificate of incorporation provided that profits and assets available for distribution be paid only to New York University's School of Law. (The predecessor to § 502(a) was enacted in 1950; the *Mueller* case concerned the 1946 tax year.) *See* S.Rep.No.2375, 81st Cong., 2d Sess. 35 (1950), U.S.Code Cong. Serv.1950, p. 3053.

■ In neither *Hospital Bureau of Standards* nor in the present case do we encounter the situation where, as in *Mueller,* a company is carrying on a trade or business for profit, with the *profits alone* directed towards charity, as opposed to the *activity* being directed towards a charitable purpose. In *Hospital Bureau of Standards,* this court noted that:

> * * * At most, the plaintiff was performing a function which each of its member hospitals would have to assume were it not for the plaintiff's existence. * * * [158 F.Supp. 564, 141 Ct.Cl. at 96.]

The *activities* of the shared laundry services are not characteristic of an organization "carrying on a trade or business for profit." NCCS has had no taxable income since 1966. It is subject to the mandate of the directors, all of whom represent NCCS's "customers," the member hospitals. All income it receives in excess of operating costs must be returned proportionately to each member or allocated either as a credit against future services or a capital contribution.

Other federal courts have ruled that shared laundry service organizations are not feeder organizations, and have rejected Treas.Reg. § 1.502–1(b) as an improper interpretation of § 502(a). *Metropolitan Detroit Area Hospital, supra.* And the district court in *United Hospital Services, Inc., supra,* stated its objection to the Treasury Regulation and example given very clearly:

> Charitably put (no pun intended), the Court has difficulty in finding any basis in the statute, 26 U.S.C. § 502, for the underlined portion of the regulation. The statute provides quite simply that "[a]n organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under section 501 on the ground that all of its profits are payable to one or more organizations exempt under section 501 from taxation." What does this have to do with two or more such organizations setting up a not-for-profit corporation, wholly controlled by them, and not serving the public, in order to effect econo-

mies in their own charitable operations? The Court in *Hospital Bureau, supra,* gave no effect to the regulation, nor does this Court. [384 F.Supp. at 782.]

■ The fact that NCCS might preclude business opportunities of commercial laundries does not require denial of an exemption. The IRS in a Revenue Ruling has specifically rejected the notion that the commercial nature of an operation is a per se rationale for exclusion of a charitable exemption. *See* Rev.Rul. 73–104, 1973–1 Cum.Bull. 263 (1973), holding that sales of museum cards which compete with the commercial card companies do not relinquish the seller's exemption, as the sales are related to the museum's exempt purposes. And recently, in *Metropolitan Detroit,* the district court ruled that the competitive or noncompetitive nature of an organization is irrelevant in defining a feeder organization. It is the potential of a truly commercial organization to shed its noncharitable status because its profits are directed to a "charitable organization" that is the focus of § 502(a).

■ Finally, defendant argues that this case is not analogous to *Hospital Bureau of Standards,* because *Hospital Bureau of Standards* concerned a cooperative institution, whereas here, the government argues, NCCS's by-laws divide members into two categories. Capital members pay a capital contribution set by the board of trustees, and may vote on all matters before the membership. Service members merely purchase services from the organization. Defendant argues that the by-laws and corporate structure of NCCS thus allow it to earn a "profit" since the capital members can profit from the payments of service members. But this potential abuse is not a persuasive argument for denying the exemption. All the member hospitals are nonprofit. No individuals recoup gain if the capital members could and did overcharge the service members. No funds from a decrease of operational expenses are diverted to individuals or to nonexempt organizations. Thus, the potential for *Muel-*

*ler*-type abuse is lacking here; like the Hospital Bureau of Standards and Supplies. NCCS is not a feeder organization.

The petition does not state as to what dates our declaratory judgment should speak. However, defendant appeared to assert that plaintiff must file returns on form 1120 from its organization in 1966 as a commercial, nonexempt organization. Accordingly, our judgment will speak as to dates on and after that date.

Therefore, having determined that NCCS's structure and activities do entitle it to a charitable exemption, and that it is not barred from an exemption under § 501(c)(3) by either § 501(e) or the feeder provisions of § 502(a), we declare that plaintiff is organized and operated for charitable purposes within the meaning of § 501(c)(3), and has been since its organization in 1966. Plaintiff's motion for summary judgment is granted, and defendant's cross-motion is denied. Judgment is entered accordingly.