T.C. Memo. 1996-251



UNITED STATES TAX COURT



UNIVERSITY MEDICAL RESIDENT SERVICES, P.C., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

UNIVERSITY DENTAL RESIDENT SERVICES, P.C., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 21401-94X, 21402-94X.          Filed May 30, 1996.


Lawrence M. Ross, for petitioners.

Joan Ronder Domike, for respondent.



MEMORANDUM OPINION


FOLEY, Judge:  Petitioners, University Medical Resident

Services, P.C. (UMRS), and University Dental Resident Services,

P.C. (UDRS), seek a declaratory judgment under section 7428(a)

that they are exempt from Federal income taxation under section

501(a) as organizations meeting the requirements of section 501(c)(3).  Although they filed separate petitions, these cases were consolidated under Rule 141(a).  Pursuant to Rule 122, the cases were submitted for decision based on the stipulated administrative records as defined in Rule 210(b)(10).  Petitioners have exhausted their administrative remedies within the Internal Revenue Service as required by section 7428(b)(2) and Rule 210(c)(4), received final adverse rulings dated August 26, 1994, and invoked the jurisdiction of this Court by petitions filed on November 21, 1994.

Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

Petitioners are professional service corporations organized under the not-for-profit corporation law of the State of New York.  Each petitioner's principal place of business was in Buffalo, New York, at the time their respective petitions were filed.

Prior to 1983, the State University of New York at Buffalo, New York (the University), sponsored graduate clinical training programs in medicine and dentistry.  Within the University, these programs were administered by the School of Medicine and Biomedical Sciences and the School of Dental Medicine

(collectively, the Schools). The clinical training provided is a prerequisite to the professional licensing of doctors and dentists in New York State.

The University does not maintain its own medical center. To provide the necessary clinical training, the University relies on its affiliation with several teaching hospitals in the Buffalo area. All clinical programs are conducted at one or more teaching hospitals.

Prior to 1983, the Schools and the affiliated teaching hospitals administered their own programs for the clinical education of medical and dental residents and fellows (hereinafter residents and fellows will be referred to collectively as residents). Each hospital employed its own residents, met its own payroll, and provided its own benefits packages. No one hospital or school had the resources necessary to implement a comprehensive program. As a result, the Schools and the affiliated teaching hospitals had difficulty maintaining accreditation for their programs.

In 1981, new accreditation standards, effective beginning in 1982, were announced by the Accreditation Council for Graduate Medical Education (ACGME). These standards required greater centralization of decision-making where two or more institutions join together to provide medical education. In such cases, the standards required the establishment of mechanisms to ensure that

the operations of individual institutions are consistent with the overall mission of the group of institutions.

In 1983, the Schools and the affiliated teaching hospitals responded to the new accreditation standards by entering into a contract entitled "The Graduate Medical and Dental Education Consortium of Buffalo" (the Consortium Agreement). The Consortium Agreement created a membership organization (the Consortium) comprising the Schools and several affiliated teaching hospitals.

Through the Consortium Agreement, decision-making related to the conduct of clinical training programs was centralized, and the Consortium became the sole sponsoring institution with ultimate responsibility for all clinical training programs conducted at any of the hospitals. The Consortium Agreement states:

> The Graduate Medical Dental Education Consortium of Buffalo * * *, established in 1983, is a membership organization designed to coordinate and manage the graduate medical and dental education programs * * * approved by the Accreditation Council for Graduate Medical Education (ACGME) and the American Dental Association (ADA) throughout the affiliated teaching institutions in Western New York. * * * [The Consortium] is the sponsoring institution of record for graduate medical and dental education programs in Western New York in compliance with the requirements of the ACGME and ADA. * * * [The Consortium] provides overall management and assumes final responsibility for that graduate medical and dental education.

All decisions relating to program operations, resource allocations, residents' grievances, disciplinary actions, and

policy development are made by the Consortium.  It makes and implements these decisions through meetings of the Consortium, a coordinating board that makes recommendations to the Consortium, and three standing committees.  Each of these organizational units consists of representatives from the Schools and the affiliated teaching hospitals.  Prior to 1991, the Schools and the member hospitals employed their own residents.

In June of 1991, UMRS and UDRS were incorporated.  The certificates of incorporation, filed in June of 1991 and amended in April of 1992, state that the corporations were formed to render those professional services that a doctor (in the case of UMRS) or a dentist (in the case of UDRS) is authorized to render. They further state that the corporations may engage in any activity that a professional service corporation is permitted to engage in under New York law, subject to the limitation that the corporations may not engage in any activity that would prevent them from qualifying under section 501(c)(3) as tax-exempt organizations.  In the event of dissolution, all assets of each corporation are to be paid to the University or, in the event that the University loses its tax-exempt status under section 501(c)(3), to a tax-exempt organization qualified under section 501(c)(3) and selected by each petitioner's board of directors.

Under New York law, the shares of professional service corporations can be issued only to individuals authorized to practice the profession that the corporation is authorized to

practice.  Although the corporations were each authorized to issue 200 shares of stock, each corporation issued only 1 share. The UMRS share is held by Michael F. Noe, M.D., UMRS's president. The UDRS share is held by Sanford I. Nusbaum, D.D.S., UDRS's president.  Each shareholder is a faculty member of the University and an employee of one of the affiliated teaching hospitals.  Each serves without compensation from petitioners.

In July of 1991, the Consortium, affiliated teaching hospitals, UMRS, and UDRS entered into the "Graduate Medical and Dental Education Consolidation Contract" (the Consolidation Contract).  The Recitals section of the Consolidation Contract provides as follows:

> I. * * * [The Consortium] is the institution of record for governing graduate medical and dental education programs in Western New York to comply with the requirements of the Accreditation Council on Graduate Medical Education, and * * * [the Consortium] provides overall management and program control for that graduate medical and dental education.  * * * [UMRS] AND * * * [UDRS] * * * are professional service corporations controlled by * * * [the Consortium].

> II.  To promote the pooling of resources dedicated to graduate medical and dental education, to improve hospital and ambulatory care and related health care for patients in the Western New York area and to coordinate more closely the academic medical and dental programs in the Teaching Hospitals, the Teaching Hospitals and * * * [the Consortium] desire to provide for the direct employment by * * * [UMRS] of the medical residents and fellows and the direct employment by * * * [UDRS] of the dental residents and fellows who are enrolled in * * * [the University] training programs conducted at the Teaching Hospitals, with coordination of the medical and dental education aspects of this employment by the Administrative Committee of * * * [the Consortium].  * * * [UMRS] and

* * * [UDRS] have been established to provide for that respective direct employment of the medical and dental residents and fellows.

The Consolidation Contract allocates responsibility among the Schools, the hospitals, the Consortium, and petitioners. It provides that, commencing July 1, 1991, all residents enrolled in academic medical programs administered by the Consortium "shall become employed by" UMRS, and all residents enrolled in academic dental programs administered by the Consortium "shall become employed by" UDRS. It further provides that the affiliated teaching hospitals would contract with petitioners for the provision of residents. Petitioners serve only the Schools and the affiliated teaching hospitals, each of which is a tax-exempt organization qualified under section 501(c)(3).

Under the Consolidation Contract, the Schools and the hospitals follow specific procedures with respect to the allocation of residents. The program directors at each of the teaching hospitals project their hospital's needs for residents and communicate that estimate to the Consortium. Applicants for residency positions submit an application to the Consortium. The Schools, the Consortium, and the teaching hospitals then select residents to meet each hospital's needs and communicate that selection to UMRS (in the case of medical residents) or UDRS (in the case of dental residents). Thereafter, a certificate of residency is issued by the Consortium, and the resident is

assigned to the appropriate hospital.  The Consolidation Contract provides:

> The parties recognize that, due to the fact that the employment of the * * * [residents] is ancillary to the primary purpose of graduate medical and dental education, the selection, credentialing, academic instruction and supervision of the * * * [residents] is, to a large extent, uniquely within the province of * * * [the University] and * * * [the Consortium], subject to the legal obligations of the respective Teaching Hospitals to supervise professional practice and other matters within their respective facilities. Accordingly, it is contemplated that * * * [UMRS] and * * *[UDRS] would have limited input into the process selecting the individuals comprising the Housestaff * * *.

The Consolidation Contract also states that petitioners have the power to "hire and fire" residents.  The affiliated teaching hospitals, however, supervise the residents and have the right to refuse to accept the assignment of a particular resident.  The Consortium and the affected teaching hospital have the right to discipline residents.  The Consolidation Contract provides that petitioners are not legally liable for lawsuits resulting from such disciplinary actions.  The Consolidation Contract further states that each hospital must provide medical malpractice insurance for the residents working at its facility and must indemnify petitioners for all liability arising out of alleged malpractice on the part of residents.

Once a resident is selected and allocated to a member hospital, the relevant petitioner assumes responsibility for the payment of all wages, benefits, and related payroll taxes and

deductions in connection with the resident's employment.  The Consortium determines the amount of compensation and benefits. At least 5 days prior to the date UMRS or UDRS makes a payment for compensation, the relevant school or hospital remits to UMRS or UDRS funds equal to the amount of the payment.  Petitioners do not engage in fund-raising activities and receive all of their funding from the Schools and hospitals.

Under the Consolidation Contract, petitioners must provide the Schools and hospitals with quarterly reports describing all receipts and disbursements, and the Consortium has the right to audit petitioners' books and records.  Because petitioners have no administrative employees, petitioners' administrative activities (i.e., processing invoices sent to the Schools and hospitals and salary payments made to residents) are performed by employees of the Schools.  Each petitioner's actual and projected annual profits, as of May of 1992, were less than one-tenth of 1 percent of gross revenue.

On August 26, 1994, respondent issued final adverse rulings notifying petitioners that they did not qualify for tax exemption.  The rulings each stated in pertinent part:

> You have failed to establish that you will be operated exclusively for exempt purposes as required by section 501(c)(3) of the Code.  Your primary activity is to provide administrative services to teaching hospitals affiliated through the Consortium with the State University of New York at Buffalo residency training program by paying salaries and fringe benefits of the residents working in these hospitals.  This activity

does not advance education within the meaning of section 1.501(c)(3)-1(d)(1) of the Income Tax Regulations. You also do not qualify under section 501(e) of the Code because you are not operating on a cooperative basis.

#### Discussion

I. In General

Section 501(a) provides an exemption from Federal income tax for organizations described in section 501(c). Section 501(c) sets forth a list of exempt organizations. The list includes organizations "organized and operated exclusively for * * * charitable * * * or educational purposes". Sec. 501(c)(3).

Section 501(e), entitled "Cooperative Hospital Service Organizations", provides that an organization will be treated as meeting the requirements of section 501(c)(3) if the organization is: (1) Organized and operated exclusively to provide listed services solely to two or more hospitals meeting certain requirements; (2) organized on a cooperative basis and paying net earnings to members within a specified time period; and (3) wholly owned by the members if the organization has capital stock. Sec. 501(e).

Petitioners contend that they are charitable and educational organizations within the meaning of section 501(c)(3). Respondent counters that petitioners are neither charitable nor educational organizations and that they are operated for a substantial nonexempt purpose. Respondent further argues that petitioners do not fit within section 501(e), and that, pursuant

to the Supreme Court's decision in <u>HCSC-Laundry v. United States</u>, 450 U.S. 1 (1981), petitioners cannot qualify under section 501(c)(3).

As a preliminary matter, we note that, in this case, section 501(e) does not preclude an analysis under section 501(c)(3). In <u>HCSC-Laundry v. United States</u>, <u>supra</u>, the Supreme Court held that section 501(e) is the exclusive provision for hospital cooperatives to qualify under section 501(c)(3) and that a hospital cooperative that does not satisfy section 501(e) cannot qualify independently under section 501(c)(3). To qualify as a hospital cooperative under section 501(e), the organization must provide services "solely for two or more hospitals". Petitioners serve <u>schools</u> in addition to hospitals. Thus, they are not hospital cooperatives, and section 501(e) does not preclude petitioners from qualifying under section 501(c)(3).

To qualify under section 501(c)(3), petitioners must establish that they are both "organized and operated" exclusively for exempt purposes. Sec. 1.501(c)(3)-1(a)(1), Income Tax Regs. Respondent concedes that petitioners are organized exclusively for exempt purposes but argues that petitioners are not operated exclusively for such purposes. An organization will be regarded as operated exclusively for exempt purposes only if it engages primarily in activities that accomplish one or more exempt purposes listed in section 501(c)(3). Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. Whether an organization is operated exclusively

for one or more exempt purposes is a question of fact to be resolved on the basis of all the evidence in the administrative record. B.S.W. Group, Inc. v. Commissioner, 70 T.C. 352, 357 (1978); Washington Research Found. v. Commissioner, T.C. Memo. 1985-570. Petitioners have the burden of establishing that the grounds for denying exemption stated in the final notices of determination were inadequate. Rule 217(c)(2)(A); Florida Hosp. Trust Fund v. Commissioner, 103 T.C. 140, 146 (1994), affd. 71 F.3d 808 (11th Cir. 1996).

## II. Qualification as "Charitable" Under Section 501(c)(3)

Petitioners argue that they are operated exclusively for "charitable" purposes. The term charitable is used in section 501(c)(3) in its generally accepted legal sense, which includes the "advancement of education" and "lessening the burdens of Government". Nationalist Movement v. Commissioner, 102 T.C. 558, 576, affd. 37 F.3d 216 (5th Cir. 1994); Sec. 1.501(c)(3)-1(d)(2), Income Tax Regs.

### A. Advancement of Education

Petitioners contend that they advance education in two ways. We reject both of petitioners' contentions. First, petitioners argue that they advance education by assisting the Schools in meeting several requirements imposed by the ACGME accreditation standards. Petitioners contend that they assist in the provision of uniform pay and benefits for residents of similar experience levels, as required by the accreditation standards. The

Consortium Agreement, however, states that the Consortium, not petitioners, determines resident compensation levels. Petitioners contend that they assist in the provision of professional liability insurance for residents, as required by the accreditation standards. The Consolidation Contract, however, states that the member hospitals, not petitioners, provide such insurance. Petitioners contend that they assist in the provision of adequate financial support to residents, as required by the accreditation standards. The Consolidation Contract, however, states that the Schools and hospitals, not petitioners, provide all funding of resident salaries and benefits. Indeed, the Consortium Agreement states that it is the Consortium, not petitioners, that generally has responsibility for ensuring compliance with the accreditation standards. Consequently, we conclude that petitioners provide the Schools and hospitals minimal, if any, assistance in meeting these standards.

Second, petitioners argue that they advance education by working with the Schools and hospitals to manage program-related activities. Petitioners, however, do not manage any educational programs. Petitioners emphasize that they have the right to hire and fire residents. The Schools and hospitals, however, have an effective veto over petitioners' hiring decisions because the Schools and hospitals have the right to refuse to allow a resident to perform his or her duties. In addition, the

Consortium handles all resident grievances including matters of termination of employment. Thus, even if the Consolidation Contract grants petitioners the right to hire and fire residents, other provisions of the contract supersede that right by delegating substantial responsibility to the Consortium and its members. Further, even if petitioners did have responsibility for the program, they have no administrative employees, so it is unclear how they would discharge this responsibility. Petitioners have not met their burden of establishing that they advance the education of residents.

B.   Lessening the Burdens of Government

Petitioners also argue that they lessen the burdens of Government. An organization lessens the burdens of Government if (1) the activities undertaken are those that the Government considers to be its burden, and (2) those activities actually lessen such burdens. Columbia Park & Recreation Association v. Commissioner, 88 T.C. 1, 21 (1987), affd. without published opinion 838 F.2d 465 (4th Cir. 1988).

Petitioners have not established that the Schools and/or hospitals constitute governmental agencies. Nor have they established that the activities they have undertaken are those that the Government considers its burden. Even if we assume that petitioners had established these points, their activities do not lessen any burdens. All of petitioners' financial support comes from the Schools and hospitals. The cost of paying salaries and

providing benefits is passed on to the Schools and hospitals and is the cost that would be incurred if the Schools and hospitals payed the residents themselves.  Further, the administrative costs of these activities are not assumed by petitioners because the work is performed by employees of the Schools.

Petitioners argue that Rev. Rul. 85-2, 1985-1 C.B. 178, supports their contention that they should qualify as exempt organizations.  We disagree.  In that revenue ruling, the rules of a local court required the appointment of guardians ad litem to represent children in cases involving abuse.  An organization was formed to train volunteer guardians who ultimately replaced court-hired attorneys.  The organization was not fully funded by the court.  Thus, the organization lessened the burdens of Government.  In the present case, petitioners are funded in full by the Schools and hospitals.  Petitioners do not contribute any funds toward the education of residents.  Consequently, the revenue ruling is not applicable.

III. Qualification as "Educational" under Section 501(c)(3)

Petitioners' final argument is that they qualify as "educational" organizations.  Generally, the term "educational" as used in section 501(c)(3) relates to (1) the instruction or training of an individual for the purpose of improving or developing his capabilities or (2) the instruction of the public on subjects useful to an individual and beneficial to the community.  Sec. 1.501(c)(3)-1(d)(3), Income Tax Regs.

Petitioners do not claim to qualify independently as educational organizations, but contend, under the integral part doctrine, that they are entitled to share in the Consortium members' exempt status. See Hospital Bureau of Standards & Supplies, Inc. v. United States, 141 Ct. Cl. 91, 158 F. Supp. 560 (1958).

The integral part doctrine is not a codified rule, but is a judicial doctrine recognized in cases, regulations, and revenue rulings as a basis for derivative exemption under section 501(c)(3). The cases applying this doctrine have held that where an organization (1) bears a "close and intimate relationship" to the operation of one or more tax-exempt organizations, and (2) provides a "necessary and indispensable" service solely to those tax-exempt organizations, it will take on the exempt status of those organizations. See, e.g., Hospital Bureau of Standards & Supplies, Inc. v. United States, supra at 562; Council for Bibliographic & Info. Technologies v. Commissioner, T.C. Memo. 1992-364.

The rationale behind the integral part doctrine is that an organization that takes over an essential task which would otherwise have to be performed by the organizations served should be exempt because the members would continue to be exempt if they performed the task themselves. Cf. Hospital Bureau of Standards & Supplies, Inc. v. United States, supra at 562-563 (concluding that an organization that took over an essential task was exempt under integral part doctrine); Nonprofits' Ins. Alliance v.

United States, 32 Fed. Cl. 277, 288 (1994) (concluding that an organization that took over a nonessential task was not exempt under the integral part doctrine).  In cases granting exemption based on the integral part doctrine, the organization seeking exemption invariably contributed to the attainment of its members' exempt purpose.  Nonprofits' Ins. Alliance v. United States, supra; cf. Northern Cal. Cent. Servs., Inc. v. United States, 219 Ct. Cl. 60, 591 F.2d 620 (1979) (involving an independent corporation that provided higher quality laundry services for member hospitals at lower cost in furtherance of their exempt purpose); Estate of Thayer v. Commissioner, 24 T.C. 384 (1955) (involving an independently funded trust that published a newsletter and operated a scholarship program in furtherance of a university's exempt purpose).

In the present case, petitioners' function is merely incidental to the exempt purpose of the organizations they serve.  Indeed, the Consolidation Contract states that "the employment of the * * * [residents] is ancillary to the primary purpose of graduate medical and dental education".  (Emphasis added.)  A comparison of the facts in Hospital Bureau and Council for Bibliographic & Info. Technologies with those in the present case further establishes this point.  In Hospital Bureau and Council for Bibliographic & Info. Technologies, the organizations seeking exemption took over functions previously performed by the organizations they served in order to achieve cost reductions and

better achieve the organizations' exempt purpose.  Hospital

Bureau of Standards & Supplies v. United States, supra (involving

a corporation that took over the purchasing of hospital supplies

in order to achieve volume discounts for its members); Council

for Bibliographic & Info. Technologies v. Commissioner, supra

(involving a corporation that took over operation and maintenance

of a computerized library research system enabling member

libraries to better perform their exempt functions).  In the

present case, petitioners are superfluous corporate shells that

make no cognizable contribution to the education of residents.

Despite petitioners' incorporations, all funds continue to be

provided by the Schools and hospitals, and all program-related

decisions continue to be made through the Consortium.  The

Schools and the hospitals continue to supervise and train the

residents and pay their salaries.  In addition, the Consortium

continues to make the policy decisions, just as it has since

1983.  The only change since the incorporation of petitioners is

that the money used to pay residents is funneled through

petitioners before it reaches the residents.  As the

Consolidation Contract states, the Consortium has "overall

management and program control" with respect to the education of

residents.  Petitioners are merely "corporations controlled by

* * * [the Consortium]."  In substance, petitioners appear to be

appendages rather than integral parts.

IV. <u>Conclusion</u>

We hold that petitioners have not satisfied their burden of establishing that respondent's final adverse determinations were erroneous.  Our holding is consistent with the policy underlying section 501(c)(3).  The Supreme Court has stated that Congress, in enacting section 501(c)(3), sought to "encourage the development of private institutions that serve a useful public purpose or supplement or take the place of public institutions of the same kind."  <u>Bob Jones Univ. v. United States</u>, 461 U.S. 574, 588 (1983).  In essence, an organization obtains exemption from tax under section 501(c)(3) in recognition of its contribution to the public.  Petitioners make no such contribution.

To reflect the foregoing,

<u>Decisions will be entered for respondent</u>.