ASSOCIATED HOSPITAL SERVICES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12004–78X.    Filed May 6, 1980.

*Nathan Greenberg,* for the petitioner.
*Elizabeth D. De Priest,* for the respondent.

OPINION

NIMS, *Judge:* Respondent determined that (1) petitioner is a feeder organization described in section 502; (2) is not an organization described in section 501(e); and (3) therefore is not an exempt organization under section 501(c)(3).[1]

Petitioner has invoked the jurisdiction of this Court, pursuant to section 7428, for a declaratory judgment that it is exempt from tax under section 501(c)(3). Petitioner has satisfied the prerequisites for this declaratory judgment action: It has exhausted its administrative remedies as required under section 7428(b)(2); it is the organization the classification of which is at issue, as required under section 7428(b)(1); and it filed its

---

[1]All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated.

petition herein in a timely fashion as required under section 7428(b)(3).

The case was submitted under Rule 122, Tax Court Rules of Practice and Procedure, pursuant to an order of the Court dated July 18, 1979. The record, on the basis of which the case was submitted, consists of the pleadings, the administrative record to which the parties have stipulated, and a supplemental stipulation of facts. The facts contained in the administrative record and the supplemental stipulation are assumed to be true for the purposes of this proceeding. See Rule 217, Tax Court Rules of Practice and Procedure.

The tax years to which respondent's final adverse ruling relates are the years 1969 to 1977, inclusive. However, this proceeding relates both to the initial qualification and the continuing qualification of petitioner as an organization described in section 501(c)(3).

Petitioner is a Louisiana nonprofit corporation whose principal place of business, at the time of filing the petition herein, was 7639 Townsend Place, New Orleans, La.

The issue for our decision is whether petitioner is a feeder organization under section 502 and, if not, whether it is exempt from tax under section 501(a) by virtue of being an exempt organization under section 501(c)(3).

Petitioner was incorporated on September 8, 1969, by six hospitals: Sara Mayo Hospital, Methodist Hospital, St. Claude General Hospital, Flint Goodridge Hospital of Dillard University, all of which are described in section 501(c)(3); and West Jefferson General Hospital and East Jefferson General Hospital, both of which are owned and operated by Jefferson Parish, a political subdivision of the State of Louisiana. Currently, petitioner has four participating members: Sara Mayo, East Jefferson, Flint Goodridge, and Methodist. Since its inception, petitioner's sole activity has been to provide laundry service to its members.

Under petitioner's articles of incorporation, membership is composed of only one participating class, namely, nonprofit hospitals or other nonprofit health care institutions. Petitioner was organized to serve member hospitals and health care institutions located in Orleans, Jefferson, St. Charles, St. Bernard, Placamines, St. Tammany, and neighboring parishes in

Louisiana. The board of directors is composed of two individuals from each participating member.

To commence operations, petitioner in 1971 received a construction loan of $925,000, plus Hill-Burton funds and loans from its four-member hospitals totaling $484,130.

Subsequently, petitioner contracted with its four participating members to provide laundry services for a period of 20 years. Each hospital committed itself to send a minimum poundage of laundry to petitioner and each member agreed to pay its respective pro rata cost of operations, including debt service, taxes, and insurance.

Assessments of participating hospitals are determined annually and vary according to petitioner's cost of operations. The basic pricing unit is per pound of linen serviced. The monthly payments by the member hospitals to petitioner are based upon actual operating expenses, debt service, and business reserves.

Petitioner provides 24-hour service to its members, 6 days per week. It uses bactericides which provide a longer shelf life for the laundry, freer from bacteria than laundry serviced by commercial laundries. Clean linen and soiled linen are handled in separate areas of the plant, and the clean linen is returned to the hospitals on sterilized carts, ready for distribution. Although there are commercial laundries in the parishes served by petitioner, petitioner's type of bacteria-free service is presently unobtainable from commercial laundries. In general, petitioner is operated in such a way that it realizes little or no net income. However, it is not so operated as to furnish its services at less than cost.

The essence of petitioner's argument is that petitioner is an extension of each of the participating institutions which are, themselves, nonprofit hospitals; consequently, petitioner itself is a section 501(c)(3) exempt organization.

Respondent argues that section 501(e) is the exclusive provision under which a hospital service organization may gain tax-exempt status as a charitable organization, and when Congress enacted section 501(e) hospital service organizations performing laundry services were deliberately excluded. Since Congress deliberately excluded laundry services from section 501(e), argues respondent, it was the legislative intent that petitioner may not avail itself of the provisions of section 501(c)(3). Respondent takes the position that petitioner does not qualify

for tax-exempt status under section 501(c)(3) because without the shield of section 501(e), petitioner is a feeder organization under section 502 and the regulations thereunder.

## *Background*

The tax history of hospital service organizations, and laundry service organizations in particular, is a long and stormy one. The feeder organization provisions, which respondent contends apply to petitioner here, were first added to the statute by an amendment to section 101 of the 1939 Code. Section 301(b) of the Revenue Act of 1950, Pub. L. 814, ch. 994, 64 Stat. 953, 81st Cong., 2d Sess., September 23, 1950, added an unnumbered penultimate paragraph to section 101 which read in part as follows:

An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under any paragraph of this section on the ground that all of its profits are payable to one or more organizations exempt under this section from taxation. * * *

The above provision of the 1939 Code was carried over intact as section 502 of the 1954 Code. The feeder organization regulations were originally adopted by T.D. 5924 on August 4, 1952, as sec. 29.101–3(b), Regs. 111, subsequently becoming sec. 39.101–2(b), Regs. 118.

Section 39.101–2(b), Regs. 118, provided in part as follows:

if a subsidiary organization of a tax-exempt organization would itself be exempt on the ground that its activities are an integral part of the exempt activities of the parent organization, its exemption will not be lost because, as a matter of accounting between the two organizations, the subsidiary derives a profit from its dealings with its parent organization, for example, a subsidiary organization which is operated for the sole purpose of furnishing electric power used by its parent organization, a tax-exempt educational organization, in carrying on its educational activities. However, the subsidiary organization is not exempt from tax if it is operated for the primary purpose of carrying on a trade or business which would be an unrelated trade or business (that is, unrelated to exempt activities) if regularly carried on by the parent organization. For example, if a subsidiary organization is operated primarily for the purpose of furnishing electric power to consumers other than its parent organization (and the parent's tax-exempt subsidiary organizations), it is not exempt since such business would be an unrelated trade or business if regularly carried on by the parent organization. Similarly, if the subsidiary is owned by several unrelated exempt organizations, and is operated for the purpose of furnishing electric power to each of them, it is not exempt since such business

would be an unrelated trade or business if regularly carried on by any one of the tax-exempt organizations.

The above-quoted provision of Regs. 118 was carried over intact to section 1.502–1(b), Income Tax Regs. The applicability of this provision of the regulations is central to a resolution of the problem before us, and is analyzed in detail *infra*.

Implicit in the adoption of the feeder organization amendment to section 101 of the 1939 Code and the feeder provisions of section 502 is the rejection of the so-called "destination of income" test, under which tax-exempt status turned not on the business source but on the exempt end use to which the income of the organization is put. *Trinidad v. Sagrada Orden*, 263 U.S. 578 (1924); *Roche's Beach, Inc. v. Commissioner*, 96 F.2d 776 (2d Cir. 1938); P. Treusch & N. Sugarman, Tax-Exempt Charitable Organizations 177 (1979).

Comprehensive legislative history of the feeder organization provisions up to 1969 is contained in our opinion in *University Hill Foundation v. Commissioner*, 51 T.C. 548 (1969), revd. 446 F.2d 701 (9th Cir. 1971), cert. denied 405 U.S. 965 (1972). Accordingly, we will not repeat such history except as it bears on the question of hospital service organizations as feeder organizations.

Following the adoption of the feeder organization regulations quoted in detail above, the Commissioner ruled, in Rev. Rul. 54–305, 1954–2 C.B. 127, that a corporation organized and operated for the primary purpose of operating and maintaining a purchasing agency for the benefit of a number of exempt hospitals—members of the corporation—was engaged in business activities which would be unrelated activities if carried on by any one of the tax-exempt organizations served. The ruling stated that "it is apparent that such activities in themselves cannot be termed charitable, but are ordinary business activities." The ruling quoted in detail the regulation which we have quoted, and relied upon it as the basis for denying the corporation in question exempt status under section 101 of the 1939 Code.

In connection with its 1950 Revenue Act codification of the feeder organization concept, Congress explained that the changes were made because business-involved exempt organizations had obtained an unfair competitive advantage over nonexempt, fully taxable organizations engaged in similar

business pursuits, and also because the proliferation of exempt organizations caused a drain on the revenue. 98 Cong. Rec. 13273 (1950); S. Rept. 2375, 81st Cong., 2d Sess. 28–29 (1950), 1950–2 C.B. 483; P. Treusch & N. Sugarman, *supra* at 178. Rev. Rul. 54–305, *supra*, made no effort to analyze the commercial aspects of the subject corporation's activities, notwithstanding the foregoing legislative rationale for the adoption of the feeder organization provisions. In other words, the ruling would appear to have simply assumed certain facts, the existence of which were essential to the adverse (to the taxpayer) conclusion reached.

The foregoing approach by the Internal Revenue Service has persisted consistently from the date of the promulgation of Rev. Rul. 54–305 to and including the presentation of the case before us. Furthermore, neither party here does anything more than trace the periphery of the regulation's rationale, which, in our view, leaves us the task of exploring, unaided, the very core of the problem presented. A significant question which must be answered is whether or to what extent the legislative intent of the feeder organization provisions went beyond a mere abrogation of the destination-of-income test.

In 1958, the Court of Claims, in *Hospital Bureau of Standards & Supplies, Inc. v. United States*, 141 Ct. Cl. 91, 95, 158 F. Supp. 560, 563 (1958), held that a cooperative purchasing organization which served exempt hospitals was itself an exempt organization under section 101(6) of the 1939 Code and was not a feeder organization because it was not an "organization operated for the primary purpose of carrying on a trade or business for profit." Instead, the corporation in question was found to have been engaged in a business enterprise that bore a close and intimate relationship to the functioning of the tax-exempt institutions comprising its members and, therefore, was an "integral part of the operations of its hospital members."

The Court of Claims, in *Hospital Bureau of Standards & Supplies, Inc.*, questioned the applicability of the predecessor of present section 1.502–1(b), Income Tax Regs., to a membership corporation where the members are engaged in related charitable activities; e.g., where the corporation is composed entirely of member hospitals and where its services are available only to the member hospitals. Without further elucidation as to its reasoning, the court held that "To construe the Regulations as denying

exemption in [such a] case would require distortion of the language employed."

The Commissioner declined to go along with the result in *Hospital Bureau of Standards & Supplies, Inc.*, and rather obliquely attempted to solidify his position by amending section 1.502–1(b), in T.D. 6662, 1963–2 C.B. 214, 216, to limit the concept of related organizations to a formal parent-subsidiary relationship. The amendment stated that "An exempt organization is not related to another exempt organization merely because they both engage in the same type of exempt activities." It might be observed in this connection that the question of whether the common owners of the scrutinized corporation are or are not related to each other is totally beside the point—a more relevant inquiry, as we will discuss subsequently herein, would appear to be whether the service organization is integrally related to the common owners.

In addition to adding the foregoing definition of "related" to regulation sec. 1.502–1(b), the Commissioner also quietly substituted the word "organization" for the word "subsidiary" in the sentence in (b) which previously commenced: "Similarly, if the *subsidiary* is owned by several unrelated exempt organizations." (T.D. 6662, *supra*, 1963–2 C.B. at 216. Emphasis added.) Apparently, the Commissioner realized that the inaccurate use of the word subsidiary[2] in this sentence drew too much attention to the close relationship between the controlled corporation and its tax-exempt owners.

Subsequent to the above oblique nonacquiescence by the Commissioner in the *Hospital Bureau of Standards & Supplies* case, Congress on several occasions considered the consequences of the Commissioner's position.

In 1967, Congress passed the Partnership for Health Amendments of 1967, Pub. L. 90–174, 81 Stat. 533. Section 11 of the House bill would have allowed Hill-Burton funds for joint hospital service organizations regardless of their exempt status under the Internal Revenue Code. The House report recognized that the Internal Revenue Service was refusing to recognize the "nonprofit" status of an organization established by a group of

---

[2]Defined in Webster's New Collegiate Dictionary as "a company controlled by another company which owns at least a majority of its shares."

tax-exempt hospitals. H. Rept. 538, 90th Cong., 1st Sess. 32 et seq. (1967). This provision did not become law.

Later in 1967, the Senate added an amendment to the Social Security Amendments of 1967, Pub. L. 90–248, 81 Stat. 821, which would have created a new section 501(e) to treat joint hospital service organizations as section 501(c)(3) exempt organizations. This effort also failed. See H. Conf. Rept. 1030, 90th Cong., 1st Sess. 1, 73 (1967).

Thereafter, the Senate, in considering the Tax Adjustment Act of 1968, again adopted an amendment which would have treated joint entities created by hospitals as charitable organizations. 114 Cong. Rec. (Part 6) 7516. Senator Carlson, the cosponsor of the amendment, succinctly summarized the reasons given by the Internal Revenue Service for its position and the reasons why tax exemption was deemed to be needed, as follows:

When a tax-exempt hospital performs these functions for itself, there is no tax problem. When a hospital performs these services for other hospitals, or joins with others institutions to create a joint venture, unfortunately, tax exemption is denied to the entity conducting the joint activity. The reasons given by the Internal Revenue Service are these:

First. Under the regulations to section 502 of the Internal Revenue Code, the group joint, or cooperative efforts of hospital would be "feeder" organizations, intended to feed profits of business ventures to the exempt institutions. The regulations also deny tax exemption where the organization has a "multiple parentage" although exclusively made up of nonprofit organizations.

Second. Even if the joint activity were not a "feeder" corporation, it would not be entitled to exemption under section 501(c)(3) because, of or by itself, it would not be engaged in the charitable, educational or scientific functions which are the basis for the exemption of its member hospitals.

Why is the Federal tax exemption needed? For one reason, it is essential in order to attract grants from charitable foundations and gifts from individuals. Neither would be willing to donate without assurance of tax deductibility of the gift. Second, the accounting practice sometimes shows income, subject to tax, as a "paper profit" when, for example, loans are amortized more rapidly than the depreciation of the plant or equipment they have financed. And third, without the appropriate Federal exemption, in many States the organization would be denied exempt status under State law and would be faced with real estate, sales, and income taxes; * * * [114 Cong. Rec. (Part 6) 7516.]

The Senate version of the above bill would have treated virtually all entities established by tax-exempt hospitals as charitable organizations. The House, however, would accept only a more limited version of the Senate amendment. In recommending the adoption of the provisions that were added to the Code as section 501(e), the managers on the part of the House

emphasized that only the service organizations specified in its version of the bill were to be treated as "organized and operated exclusively for charitable purposes," and expressly excluded mutually owned laundry service organizations. H. Conf. Rept. 1533, 90th Cong., 2d Sess. 43 (1967). The Conference report stated that "The new subsection does not grant tax-exempt status if the hospital service organization performs any service other than those specified in the new subsection (for example, laundry services)."

As thus finally adopted, section 501(e) provides a per se rule to cover the following jointly conducted activities: data processing, purchasing, warehousing, billing and collection, food, clinical, industrial engineering, laboratory, printing, communications, record center, and personnel (including selection, testing, training, and education of personnel) services. Laundry services are not included.

In 1969, the Commissioner issued a comprehensive revenue ruling in which he answered questions involving the tax-exempt status of (1) hospitals that establish a cooperative hospital laundry service and (2) a hospital which establishes its own laundry facilities and sells service to other hospitals. Rev. Rul. 69–633, 1969–2 C.B. 121. Essentially, the Commissioner ruled that an organization formed by a number of exempt hospitals to perform cooperative laundry service cannot qualify under section 501(c)(3) because laundry services are not one of the services specified in section 501(e). Also, the Commissioner ruled that if one exempt hospital sells laundry services to another exempt hospital, such activity would be unrelated trade or business within the meaning of section 513 and any profits derived therefrom would be subject to the unrelated business income tax imposed by section 511.

With regard to the laundry cooperative, Rev. Rul. 69–633 points out that, if all of the organization's net earnings derived from dealings with patrons are distributed or allocated pursuant to a preexisting obligation to the patron hospitals within the time and manner prescribed for cooperative organizations in sections 1381–1383 of the Code, the organization would have no taxable income from such dealings. For a variety of reasons, however, some of which are listed in Senator Carlson's Statement, *supra,* this result did not satisfy the hospitals.

In Rev. Rul. 69–160, 1969–1 C.B. 147, the Commissioner had

previously ruled that a hospital service organization which performs laundry services for its member hospitals does not meet the requirements of section 501(e)(1)(A) of the Code and therefore does not qualify for exemption.

Subsequent to the enactment of section 501(e), a Federal District Court held that the addition of this provision did not preclude a joint hospital laundry organization from qualifying as a charitable organization under section 501(c)(3). *United Hospital Services, Inc. v. United States*, 384 F. Supp. 776, 781 (S.D. Ind. 1974). The court reasoned as follows:

The clearly expressed Congressional purpose behind the enactment of Section 501(e) was to enlarge the category of charitable organizations under Section 501(c)(3) to include certain cooperative hospital service organizations, and not to narrow or restrict the reach of Section 501(c)(3). The latter section was not modified by the legislation in any way, and the legislation does not purport to take away charitable status from a corporation which had already acquired it. Insofar as this case is concerned, therefore, Section 501(e) is irrelevant.

The next chapter in this perplexing saga was written in connection with the legislative activities leading up to the enactment of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520. A renewed effort was made to include hospital laundry services in the per se list of section 501(e). Intensive lobbying efforts, both for and against such inclusion, took place. The Senate Finance Committee conducted extended hearings, and detailed and persuasive statements were submitted by, among others, the American Hospital Association in support of the amendment and the Linen Supply Association of America in opposition thereto. Hearings on H.R. 10612, Before the Senate Comm. on Finance, 94th Cong., 2d Sess. 2765 (1976).

The American Hospital Association maintained, among other things, that hospital costs would be held down through economies of scale obtainable through the use of tax-exempt jointly operated hospital laundries. The Linen Supply Association of America urged, among other things, that while cooperative hospital laundries would require Federal capital funding, private linen supply companies provide their own capital funding. Also, tax-exempt laundries were said to be able to compete unfairly with taxable commercial laundries.

The Senate Finance Committee version of the Tax Reform Act of 1976 would have amended section 501(e) to include laundry services in the per se list, but this inclusion was struck

on the floor of the Senate and was not restored by the Conference Committee. 122 Cong. Rec. S 13565, S 13568; S. Rept. 94–1236, 94th Cong., 2d Sess. 537 (1976), 1976–3 C.B. (Vol. 3) 808, 941.

Subsequent to the congressional consideration of the question in connection with the 1976 Tax Reform Act, the Court of Claims and four District Courts have considered the question of whether hospital laundry service organizations are exempt under section 501(c)(3), and all have found in favor of exemption: *Northern Cal. Central Services, Inc. v. United States*, 219 Ct. Cl., 591 F.2d 620 (1979); *Metropolitan Detroit Area Hospital v. United States*, 445 F. Supp. 857 (E.D. Mich. 1978), on appeal (6th Cir., June 7, 1978); *HCSC-Laundry v. United States*, 473 F. Supp. 250 (E.D. Pa. 1979); *Community Hospital Services, Inc. v. United States*, an unreported case (E.D. Mich. 1979, 43 AFTR 2d 79–934, 79–1 USTC par. 9301), on appeal (6th Cir., May 29, 1979); *Hospital Central Service Assn. v. United States*, an unreported case (W.D. Wash. 1977, 40 AFTR 2d 77–5646, 77–2 USTC par. 9601), on appeal (9th Cir., Oct. 6, 1977); *Chart, Inc. v. United States*, 491 F. Supp. 10 (D. D.C. 1979, 45 AFTR 2d 80–555, 79–2 USTC par. 88,725).

As respondent points out in his reply brief, the question presented is one of first impression in this Court and is one on which no Circuit Court has yet spoken.

## Analysis of Regulation

With the above historical background in mind, we now turn to the merits of the case before us. As previously indicated, petitioner's argument is that it qualifies for exempt status as it is simply an extension of the organizations which control it, all of which are tax exempt. Respondent's position is that petitioner does not qualify under section 501(e) and it is rendered non-tax-exempt by virtue of being a feeder organization under section 502.

Section 502(a) provides that—

An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under section 501 on the ground that all of its profits are payable to one or more organizations exempt under section 501 from taxation * * *

Section 1.502–1(b), Income Tax Regs., provides, in pertinent part, that—

> (b) If a subsidiary organization of a tax-exempt organization would itself be exempt on the ground that its activities are an integral part of the exempt activities of the parent organization, its exemption will not be lost because, as a matter of accounting between the two organizations, the subsidiary derives a profit from its dealings with its parent organization * * * . However, the subsidiary organization is not exempt from tax if it is operated for the primary purpose of carrying on a trade or business which would be an unrelated trade or business (that is, unrelated to exempt activities) if regularly carried on by the parent organization.

The text of regulation section 1.502–1(b) (quoted *supra* as part of section 39.101–2(b), Regs. 118) contains three examples which may be fairly paraphrased as follows:

*Example (1).* A subsidiary organization is exempt if it is operated for the sole purpose of furnishing electric power used by its parent organization, a tax-exempt educational organization, in carrying on its educational activities;

*Example (2).* A subsidiary organization is not exempt if it is operated primarily for the purpose of furnishing electric power to consumers other than its parent organization (and the parent's tax-exempt subsidiaries) since such business would be an unrelated trade or business if regularly carried on by the parent organization; and

*Example (3).* An organization owned by several unrelated exempt organizations and operated for the purpose of furnishing electric power to each of them is not exempt since such business would be an unrelated trade or business if regularly carried on by any one of the tax-exempt organizations.

Respondent contends that the instant case fits squarely within the third of the above examples, as indeed it does, that this regulation is valid and consequently that section 502 poses a barrier to petitioner's attempt to qualify for exempt status.

A counter argument would be that section 502 was a finely tuned legislative response to an admittedly significant but very narrow problem not encompassed by the present case, that the analogy in the examples to cases where the unrelated trade or business is carried on by the parent is inapposite, and hence that the third example is invalid. It follows from this construction of section 502 that a hospital laundry service operation which realizes no profit, or profits only to the extent permitted by its

tax-exempt members, and operates exclusively for the benefit of its tax-exempt members, cannot reasonably be defined as a trade or business operated for a profit within section 502.

As we have already indicated, section 502 finds its roots in the Revenue Act of 1950. In that legislation, Congress first addressed the problems occasioned by the proliferation of tax-exempt organizations. At the time, there was a feeling that a tax exemption gave an unfair economic advantage to putative tax-exempt organizations competing with commercial enterprises. *Orton Foundation v. Commissioner*, 56 T.C. 147, 159–160 (1971).

The Revenue Act of 1950 sought to assure the continued vitality of certain segments of the private sector by removing the tax advantage accruing to some would-be tax-exempt organizations the endeavors of which put them in competition with commercial enterprises. To this end, Congress adopted a bifurcated approach. First, Congress sought, through what is now section 511, to tax "unrelated business income" of an exempt enterprise. Sections 512 and 513 provide a labyrinthine definition of "unrelated business income." Suffice it to say that "unrelated business income" is income generated by a trade or business the conduct of which is not substantially related to the organization's exempt purpose.

Second, in what is now section 502, Congress denied a tax exemption to so-called "feeder organizations," defining that concept as "organizations operated for the primary purpose of carrying on a trade of business for profit" which, the statute says, shall not be exempt under section 501 on the ground that all its profits go to an exempt organization. There is an inference here that Congress was willing to leave the door open to exemption on other grounds.

Prior to the enactment of what is now section 502, a number of otherwise commercial organizations were held to be exempt organizations merely because they paid over all their profits to an exempt organization. In terms of the statute, these organizations were found to be "organized" and "operated" solely for exempt purposes.

Perhaps the most striking case, and certainly the situation that generated the most unfavorable publicity, was *C. F. Mueller Co. v. Commissioner*, 190 F.2d. 120 (3d. Cir. 1951), revg. 14 T.C. 922 (1950), which involved the New York University

School of Law's ownership of the nation's then-largest manufacturer of noodles. In 1947, a group of N.Y.U. benefactors purchased the company and designated that it was to operate solely for the benefit of the law school. Because the profits were to be paid to an exempt organization, the Third Circuit found that Mueller was operated solely for a charitable purpose and thus was exempt under the "destination of income" test. Naturally, this gave Mueller a substantial competitive advantage over its nonexempt competitors.

There is no doubt that section 502 was designed, at least in part, to change the result in cases sanctioning the destination of income test. The Senate Finance Committee Report explained the provision as follows:

> The effect of this amendment is to prevent the exemption of a trade or business organization under [Section 501] on the grounds that an organization actually described in [Section 501] receives the earnings from the operations of the trade or business organization. In any case, it appears clear to your Committee that such an organization is not itself carrying out an exempt purpose.[3]

The discussion of the technical provisions of the bill goes on to provide an example illustrating this point:

> The paragraph applies to organizations operated for the primary purpose of carrying on a trade or business for profit, as for example, a feeder corporation whose business is the manufacture of automobiles for the ultimate profit of an educational institution.[4]

It is against this legislative and judicial background that we would normally pose the validity of the regulations and, since this case is reflected in the third example, were we "writing on a clean slate" our determination of their validity or lack thereof would govern the ultimate outcome of this case.[5]

---

[3]S. Rept. 2375 (to accompany H.R. 8920), 81st Cong., 2d Sess. (1950), reprinted in (1950) U.S. Code Cong. & Adm. News 3053, 3088, 1950–2 C.B. 483, 509; see also H. Rept. 2319, 81st Cong., 2d Sess. 41 (1950), 1950–2 C.B. 380.

[4]S. Rept. 2375, *supra*, U.S. Code Cong. & Adm. News at 3176. The detailed technical discussion also listed cases reflecting the type of situation that would be controlled by the new law: *Roche's Beach, Inc. v. Commissioner*, 96 F.2d 776 (2d Cir. 1938); *Universal Oil Products Co. v. Campbell*, 181 F.2d 451 (7th Cir. 1950); *Willingham v. Home Oil Mill*, 181 F.2d 9 (5th Cir. 1950); *C. F. Mueller Co. v. Commissioner*, 14 T.C. 922 (1950), revd. 190 F.2d 120 (3d Cir. 1951).

[5]As discussed *infra*, we must ultimately inquire whether, in light of the extensive legislative and regulatory history, sec. 1.502–1(b), Income Tax Regs., must be deemed to have received congressional approval and has the effect of law. *Helvering v. Winmill*, 305 U.S. 79 (1938).

The instant regulation distinguishes the case where one subsidiary provides services to an exempt parent (first example above) from the case where several exempt parent organizations join together and utilize the services of one subsidiary (third example above). In the former situation, the subsidiary organization is an exempt organization if the services it provides are integrally related to the purpose of the exempt parent organization; in the latter situation, the cooperative organization is found to be nonexempt for the stated reason that "such business would not be a trade or business if regularly carried on by any one of the tax exempt organizations."

It may be assumed, for the sake of argument, that the difference between the two examples in terms of effect on competition has enough substance to support disparate treatment. Where several exempt parents band together to utilize the services of one cooperative which they own, a serious barrier to competition could be created. Conceivably, such a cooperative could trade on its tax exemption and make use of economies of scale to preempt, for example, the hospital laundry service in a particular community, thus foreclosing it to commercial enterprises. Indeed, in this respect there is little to distinguish the third example from the situation reflected in the second example in the regulations, where a subsidiary organization operated for the primary purpose of furnishing electric power to consumers other than its exempt parent organization is held to be nonexempt.

In terms of effect on competition, the case where a subsidiary provides integrally related services to only one entity, its exempt parent may, depending on the facts and circumstances, stand in contrast to the jointly owned service organization situation. In the former situation, it might be argued that the entity could not, standing alone, preempt the market because it only serves one parent, while in the latter situation, it could. On the other hand, there may be little to distinguish, in terms of frustrating commercial competition, between one giant hospital doing its own laundry and four small ones using a jointly owned cooperative.

Thus, the third example of the Commissioner's regulations may not be entirely without logic but a semblance of logic does not necessarily validate a regulation. The organization in the third example, which is like the one in the instant case, is found

to be nonexempt by analogizing it to the second example. The stated reason is that such business would be an unrelated trade or business if regularly carried on by any one of the tax-exempt organizations. But this is a non sequitur—we are not faced with the situation where the business is being carried on by only one of the exempt organizations; if we were, the answer would be easy. What the regulation should tell us is why the analogy should be made to the second example rather than the first example, where the opposite result obtains.

The question therefore becomes one of determining whether the distinctions reflected in the regulations are those chosen by Congress in enacting section 502 and acquiesced in thereafter by Congress. From a broad perspective, the regulations are on the right track. After all, the 1950 legislation was directed at the issue of competition. Moreover, petitioner bears a facile resemblance to organizations within the rubric "feeder organizations." The essence of a section 502 "organization operated for the primary purpose of carrying on a trade or business for profit" is its distinctly commercial hue: its activities must be those normally performed by commercial enterprises as distinguished from those activities that most often fall within the province of inherently exempt organizations.

Petitioner's potential for making a profit is not particularly telling here. Whether the price is set at cost so that petitioner does not make a profit or is calculated to insure petitioner a profit, all financial benefits ultimately accrue to the parent hospitals. The balance sheet figures merely reflect the bookkeeping arrangement between the service organization and its constituent or constituents, an arrangement that can be manipulated, depending on the needs and dictates of the hospitals, without any substantive effect on the parties. In this context, the words "for profit" do not establish an independent requirement; they are used in the statute merely to modify the term "trade or business" to make it clear that a section 502 organization must be a commercial organization rather than an organization operated for an inherently exempt purpose. As we said in a somewhat analogous context—*B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 357 (1978)—

The critical inquiry is whether petitioner's primary purpose for engaging in its sole activity is an exempt purpose, or whether its primary purpose is the

nonexempt one of operating a commercial business producing net profits for [itself]. * * *

Unlike the abuse situations like *Mueller,* which sections 502 and 511 were clearly meant to foreclose, we are here dealing with a closed circle. The "profit" does not derive from outside sources and flow to the exempt organizations, as in the *Mueller* line of cases. Nor does it flow from vendors to potentially nonexempt destinations, as in *B.S.W. Group, Inc. v. Commissioner, supra,* and *Federation Pharmacy Services, Inc. v. Commissioner,* 72 T.C. 687 (1979). We would therefore question whether the profit, if any, derived by petitioner was any different from the profit between an exempt parent and its wholly owned subsidiary exempted by the respondent in regulation sec. 1.502–1(b).

### Reenactment Doctrine

As we have previously suggested, were we not constrained by the weight of legislative history, we might be inclined to hold that petitioner is organized primarily for an exempt purpose and not a commercial one.

Nevertheless, it cannot be gainsaid that petitioner's activities are very substantial, and section 1.502–1(a), Income Tax Regs., provides that a relevant inquiry in determining the primary purpose of an organization is a consideration of all the circumstances, including the size and extent of the trade or business. Also, in the Senate hearings preceding the adoption of the 1976 Tax Reform Act, where the hospitals again failed to obtain legislative exemption for their cooperative laundries, substantial emphasis was placed by the opponents on the unfair competition aspects of the proposed exemption.

The so-called "re-enactment doctrine" was first enunciated in *Helvering v. Winmill,* 305 U.S. 79, 83 (1939), in the following words:

Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received Congressional approval and have the effect of law.

However, the reenactment doctrine is not an inflexible doctrine. The Supreme Court has also said that the rule is no more than an aid in statutory construction. *Helvering v. Reynolds,* 313 U.S. 428 (1941). The uncertainty of its ambit is

attested to by the numerous occasions upon which the Supreme Court itself has had to consider the rule's applicability. See, for example, *Helvering v. R. J. Reynolds Co.*, 306 U.S. 110 (1939); *Helvering v. Wilshire Oil Co.*, 308 U.S. 90 (1939); *Fribourg Nav. Co. v. Commissioner*, 383 U.S. 272 (1966); *United States v. Correll*, 389 U.S. 299 (1967).

In any event, in *National Muffler Dealers Assn., Inc. v. United States*, 440 U.S. 472, 477 (1979), the Supreme Court recently demonstrated the continuing vitality of the reenactment doctrine by stating that:

A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute. See *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948); *Helvering v. Winmill*, 305 U.S. 79, 83 (1938).

Regardless of the difficulty encountered with the rule in other contexts, and of what our own predilections might be concerning regulation section 1.502–1(b), the case before us is one where the reenactment doctrine must be applied. As we have recited earlier, the regulation was originally promulgated on August 4, 1952 (approximately 2 years after enactment of the feeder organization provisions), and has remained substantially unchanged ever since. The Internal Revenue Service has, as we have also demonstrated, for many years consistently applied the regulation against the type of exemption which petitioner here seeks.

Notwithstanding such administrative consistency, we would be strongly inclined to make an independent evaluation of the regulation's validity were it not for the equally consistent legislative history sustaining that validity. This is not a regulation where the reenactment doctrine can be said to be applicable only by inference. Congress has on at least two widely separated occasions, while consciously recognizing the Commissioner's denial of exemption to hospital laundry service organizations, nevertherless deliberately declined to include such organizations in the section 501(e) group of cooperative hospital service organizations to which exemption has been extended. As we noted earlier in this opinion, inclusion of this specific type of

organization was considered and rejected in the Tax Adjustment Act of 1968 and the Tax Reform Act of 1976. Repeatedly, in the committee reports and on the Senate floor, the Commissioner's position adverse to exemption was expressly noted and considered.

In *Northern Cal. Central Services, Inc. v. United States*, 219 Ct. Cl. 60, 591 F.2d 620 (1979), the Court of Claims considered the issue presented in this case and concluded that the hospital laundry service organization before it qualified for tax exemption under section 501(c)(3). The Court of Claims took into consideration the adverse legislative history of section 501(e) and congressional awareness of the Commissioner's resistence to tax exemption for hospital laundry service cooperatives, but stated that "Congress appears to have viewed the matter as controversial and one as to which it was insufficiently informed. What could have been more rational than to leave such a matter to the courts?"

With due respect to the Court of Claims, the voluminous legislative history would lead one to conclude the Congress was indeed well informed on this subject—far better, perhaps, with all of the extended hearings, Committee considerations, and floor debates, than a court of law could be on the basis of an administrative record involving only one single organization. As, we trust, amply demonstrated above, Congress on numerous occasions considered and rejected the opportunity to expressly accord a tax exemption to hospital service organizations, generally, and organizations such as petitioner, particularly. We would therefore consider it an unwarranted incursion upon the domain of Congress to now find that, notwithstanding such clear expression of congressional intent, hospital laundry service organizations are exempt under section 501(c)(3). We therefore hold that petitioner is a feeder organization under section 502 and is not exempt under section 501(c)(3).[6]

---

[6]In this regard, we respectfully disagree with our brethren who have reached a contra conclusion. *Northern Cal. Central Services, Inc. v. United States*, 219 Ct. Cl. 60, 591 F.2d 620 (1979); *Metropolitan Detroit Area Hospital v. United States*, 445 F. Supp. 857 (E.D. Mich. 1978), on appeal (6th Cir., June 7, 1978); *HCSC-Laundry v. United States*, 473 F. Supp. 250 (E.D. Pa. 1979); *Community Hospital Services, Inc. v. United States*, an unreported case (E.D. Mich. 1979, 43 AFTR 2d 79-934, 79-1 USTC par. 9301), on appeal (6th Cir., May 29, 1979); *Hospital Central Services Assn. v. United States*, an unreported case (W.D. Wash. 1977, 40 AFTR 2d 77-5646, 77-2 USTC par. 9601), on appeal (9th Cir., Oct. 6, 1977); *Chart, Inc. v. United States*, 491 F. Supp. 10

To reflect the foregoing,

*Decision will be entered for the respondent.*

Reviewed by the Court.

STERRETT, *J.*, did not participate in the consideration or disposition of this case.

CHABOT, *J.*, concurring: I agree with the result and much of the analysis in the majority opinion. However, I would arrive at this result by holding that section 1.502–1(b), Income Tax Regs., is valid as a reasonable interpretation of the statute. I cannot join in the majority's conclusion that this regulation is valid because of the reenactment doctrine.

The regulation appears to draw a line between (a) activities carried on within an exempt organization or carried on solely among related[1] exempt organizations and (b) activities carried on with others. And so the regulation treats as exempt an organization that furnishes electric power solely to its exempt parent for use in the parent's exempt activities. On the other hand, the regulation treats as not exempt an organization operated primarily to furnish electric power to unrelated consumers (see n. 1 *supra*, for the regulation's detailed definition of "related" for this purpose).

After drawing this line, the regulation analogizes the activities of a cooperative of unrelated member organizations to the activities of an organization dealing with unrelated consumers; the cooperative, then, would not be exempt merely because it provides services to its members which are otherwise unrelated entities.

This line-drawing is consistent with the focus of the 1950 legislation on interference with evenhanded competition. (See

---

(D. D. C. 1979), 45 AFTR 2d 80–555, 79–2 USTC par. 88–724; *United Hospital Services, Inc. v. United States,* 384 F. Supp. 776 (S.D. Ind. 1974).

[1]Sec. 1.502–1(b), Income Tax Regs., provides in pertinent part:

For purposes of this paragraph, organizations are related only if they consist of—
  (1) A parent organization and one or more of its subsidiary organizations; or
  (2) Subsidiary organizations having a common parent organization.

An exempt organization is not related to another exempt organization merely because they both engage in the same type of exempt activities.

the description of the legislative history in *University Hill Foundation v. Commissioner*, 51 T.C. 548, 563–564 (1969), revd. 446 F.2d 701 (9th Cir. 1971).) The fourfold unsucessful efforts of the tax-exempt hospital industry to write into the statute an exemption for hospital laundry cooperatives is strong evidence that, indeed, the taxable hospital laundry industry fears the loss of business to tax-exempt cooperatives.

In view of (1) the various forms that cooperatives could take, (2) the question of whether a regional or nationwide cooperative with much advertising "muscle" should be treated the same as a purely local operation, (3) the varying degrees of competition that exist in different industries at different times and places, and (4) the question of whether a cooperative that shows consistent and accumulated profits should be treated the same as one that operates on a break-even basis, the regulation's approach to cooperatives does not appear to be an unreasonable reading of the statute.

But for the regulation before us, the view taken by the dissenting members of the Court herein (and by a number of other courts, as noted by both the majority and the dissenters) might well prevail. However, "the issue before us is *not* how *we* might resolve the statutory ambiguity in the first instance, but whether there is any reasonable basis for the resolution embodied in the Commissioner's Regulation." *Fulman v. United States*, 434 U.S. 528, 536 (1978) (emphasis in original). I conclude that there is.

On this basis, I would uphold the regulation in question, and then apply the regulation to the facts before us to reach the same result that the majority reach. *Fulman v. United States, supra; Bingler v. Johnson*, 394 U.S. 741, 749–751 (1969); *Friedman Foundation, Inc. v. Commissioner*, 71 T.C. 40, 50 (1978).

The majority proceed by a different route. They note the many efforts by the exempt hospital industry to amend the Internal Revenue Code of 1954 to clearly provide section 501(c)(3) status for organizations such as petitioner, and stress the ultimate failure of all these efforts. From this, the majority conclude that the Congress ratified the regulation in question under the reenactment doctrine.

However, examination of the legislative history of each of these attempts shows that, although the Congress clearly was aware of respondent's position on the issue, the Congress also

took pains to describe it as merely respondent's position and not as then-present law. Similarly, the Congress was cautious in describing what it enacted. The Conference Committee report on the 1968 enactment of section 501(e) (as part of the Revenue and Expenditure Control Act of 1968, Pub. L. 90–364, 82 Stat. 269, discussed at p. 221 in the majority opinion) clearly limits itself to stating that "*the new subsection* does not grant tax-exempt status" to laundry service cooperatives (emphasis supplied). The same careful limitations appear in the legislative history materials of the Tax Reform Act of 1976. See S. Rept. 94–938 (Part 2) 76–77 (1976), 1976–3 C.B. (Vol. 3) 643, 718–719; Joint Comm. on Internal Revenue Taxation, Description of Provisions Listed for Further Hearings by the Committee on Finance on July 20, 21, and 22, 1976, at p. 90 (Comm. Print July 19, 1976).

Since the Congress took such pains to avoid deciding what the law is as to organizations such as petitioner, it seems to me to be inappropriate for us to conclude that the Congress approved the regulation under the reenactment doctrine. It may be appropriate, however, to note that the result we reach—upholding the regulation in question—is consistent with the Congress' 1968 and 1976 amendments to the Code. On the other hand, invalidation of the regulation would raise many questions about the effect of the careful restrictions the Congress wrote into sections 501(f), in 1974, and 512(e), in 1976, as well as those appearing in section 501(e).

FAY, *J.*, agrees with this concurring opinion.

TANNENWALD, *J.*, dissenting: I respectfully disagree with the conclusion reached by the majority. Section 502(a), dealing with the denial of exemptions to feeder organizations, specifies "An organization operated for the primary purpose of carrying on a trade or business *for profit.*" (Emphasis added.) As the majority points out, that section was directed against the grant of exemption to a commercial organization merely because its *profit* inured to the benefit of an exempt organization—a situation typified by *C. F. Mueller Co. v. Commissioner*, 190 F.2d 120 (3d Cir. 1951), revg. 14 T.C. 922 (1950). In my opinion, consideration by the Congress of the effect of competition took place within the "for profit" context.

The examples set forth in respondent's regulations conveniently omit any reference to the "for profit" requirement of the statute. Sec. 1.502–1(b), Income Tax Regs. Although the petitioner herein was carrying on a trade or business, it clearly was not doing so for the primary purpose of profit therefrom. Indeed, as the majority concedes, it was a nonprofit organization and was "operated in such a way that it realize[d] little or no net income" (see p. 215). Such being the case, it simply does not fall within the ban of section 502(a).

Neither section 501(e) nor its legislative history, upon which the majority so heavily relies, mandates a contrary conclusion. I see no need to review the legislative history involved, which is set forth in detail in the majority opinion. It is sufficient to note that Congress was aware, as early as 1967, of the position of respondent and of the Court of Claims decision adverse thereto in *Hospital Bureau of Standards & Supplies, Inc. v. United States*, 141 Ct. Cl. 91, 158 F. Supp. 560 (1958). See S. Rept. 744, 90th Cong., 1st Sess. 200–201 (1967). See also *Northern Cal. Central Services, Inc. v. United States*, 219 Ct. Cl. 60, 591 F.2d 620, 624 (1979). The subsequent legislative history, relating to the enactment of section 501(e), simply articulates the proposition that that section does not exempt cooperative laundry services such as those engaged in by petitioners. Against this background of dual awareness and narrow articulation, I am not convinced that it can fairly be said that the reenactment doctrine should be applied to support respondent's regulation.

In sum, I would interpret section 501(e) as merely providing an automatic safe harbor for organizations providing the services specified therein, leaving organizations providing other cooperative services free to contend, as does petitioner herein, that they fall within the general exemption of section 501(c)(3). Compare section 302(b)(1) with section 302(b)(2) and (3). Under this approach, I would follow the cases cited in note 6 to the majority opinion (see p. 231) and hold that the petitioner is an exempt organization under section 501(c)(3) and not a feeder organization within the meaning of section 502(a).

FEATHERSTON, HALL, and WILBUR, *JJ.*, agree with this dissenting opinion.

WILBUR, *J.*, dissenting: I must respectfully dissent from the majority's holding that the petitioner is a feeder organization under section 502 and therefore not exempt under section 501(a). In the Revenue Act of 1950, Congress added section 502, along with the tax on unrelated business income provided by sections 511 to 513.[1] The Treasury Department described their purpose as follows:

Under the recommendation, if such activities are conducted by the exempt organization itself, the exemption of the organization would not be disturbed, but such business income would be segregated and subjected to tax. If a separate organization conducts those activities for the exempt institution, the entire income of the separate organization would be taxed.[2]

The feeder provision and the tax on unrelated business income are therefore complementary provisions dealing with business activities not in themselves related (aside from the production of income for exempt functions) to a charitable purpose. These complementary provisions provide a two-pronged approach: if the unrelated business is conducted by an otherwise exempt organization, then it is subject to the tax on unrelated business income provided by sections 511–513; if the exempt organization spins off the unrelated business into a separate entity, that entity is taxable. In either case, the activity must be related (aside from the production of income) to charitable purposes or it will be subject to tax. But if the activity is related to a charitable endeavor, it will not be subject to the unrelated business income tax when conducted by charity, and will not lose this preferred tax status by being spun off.

Applying these principles to the case before us, it can easily be seen that petitioner is not a feeder organization as contemplated by section 502 and the legislative history thereunder. The majority tells us that in petitioner's operation, "it uses bactericides which provide a longer shelf life for the laundry, freer from bacteria than laundry serviced by commercial laundries." We are also told that "petitioner's type of bacteria-free service

---

[1]Sec. 301, Revenue Act of 1950, ch. 994, 64 Stat. 906, 947, 953 (1950).

[2]Hearings Before the House Ways and Means Committee on Revenue Revision of 1950, 81st Cong., 2d Sess. (Vol. 1) 165 (1950) (Statement of Mr. Vance Kirby, Tax Legislative Counsel of the Treasury Department). This dual objective was retained throughout legislative consideration of the proposal. See K. Eliasberg, "Charity and Commerce: Section 501(c)(3)— How Much Unrelated Business Activity?" 21 Tax L. Rev. 53, 83 (1965).

[provided on a 24-hour basis, 6 days per week] is presently unobtainable from the existing commercial laundries in the area where it operates." Possibly for this reason, and also because doing their own laundry saves money, the majority notes that the Federal Government provided Hill-Burton funds to commence operations of the laundry.

It is hard to see how anything could be more related to hospital activities than washing the sheets and pillowcases used on the beds. This type of service was unobtainable commercially and its importance was recognized by the Federal Government in making Hill-Burton funds available. How can they be anything other than exempt activities?

It is quite plain that when the hospital performs these functions itself, they constitute an exempt activity. Since section 502 and the unrelated business income tax are opposite sides of the same coin, it is also plain that section 502 is inapplicable. Whether the hospital washes the sheets itself, or spins that duty off to a separate organization, is of no significance. Section 502 and the unrelated business income tax are complementary. If the activity is related in itself (aside from the production of income) to hospital functions when conducted by the hospital, it does not become a nonexempt activity simply because it is spun off.[3]

Indeed, as the majority notes, the issue the Court decides has been extensively litigated and the results have been uniformly at odds with the majority holding. *Northern Cal. Central Services, Inc. v. United States,* 219 Ct. Cl. 60, 591 F.2d 620 (1979); *Metropolitan Detroit Area Hospital v. United States,* 445 F. Supp. 857 (E.D. Mich. 1978), on appeal (6th Cir., June 7, 1978); *HCSC-Laundry v. United States,* 473 F. Supp. 250 (E.D. Pa. 1979); *Community Hospital Services, Inc. v. United States,* — F. Supp. — (E.D. Mich. 1979, 43 AFTR 2d 79–934, 79–1 USTC par.

---

[3]Sec. 1.502–1(b), Income Tax Regs., says as much. It notes that a subsidiary organization of a tax-exempt organization can be exempt "on the ground that its activities are an integral part of the exempt activities of the parent." It then states:

"However, the subsidiary organization is not exempt from tax if it is operated for the primary purpose of carrying on a trade or business *which would be an unrelated trade or business (that is, unrelated to exempt activities) if regularly carried on by the parent organization.* For example, if a subsidiary organization is operated primarily for the purpose of furnishing electric power to consumers other than its parent organization (and the parent's tax-exempt subsidiary organizations), it is not exempt *since such business would be an unrelated trade or business if regularly carried on by the parent organization.* * * * [Emphasis added.]"

9301), on appeal (6th Cir., May 29, 1979); *Hospital Central Services Assn. v. United States,* an unreported case (W.D. Wash. 1977, 40 AFTR 2d 77–5646, 77–2 USTC par. 9601), on appeal (9th Cir., Oct. 6, 1977); *Chart, Inc. v. United States,* 491 F. Supp. 10 (D. D.C. 1979, 45 AFTR 2d 80–555, 79–2 USTC par. 88–724); *United Hospital Services, Inc. v. United States,* 384 F. Supp. 776 (S.D. Ind. 1974). I would follow this extensive precedent in the case before the Court.

The majority notes that "were we not constrained by the weight of the legislative history, we might be inclined to hold that petitioner is organized primarily for an exempt purpose and not a commercial one." The legislative history to which the majority refers is not that associated with the enactment of section 502 in the Revenue Act of 1950, the section they interpret as dispositive of the case. Rather, the majority refers to a series of legislative proposals considering the exemption of hospital laundries, and concludes that since Congress declined to specifically exempt hospital laundries, it approved of respondent's interpretation of existing law. Since the legislative history to which the majority refers involves amendments added by the Senate to various bills that were either not accepted by the House or accepted only in part,[4] I am unpersuaded that the reenactment doctrine has any validity as applied to the instant case. I reach this conclusion for three reasons.

First, it is the legislative history of sections 502 and 511–513, added by the Revenue Act of 1950, that we are concerned with, and what Congress intended in enacting that law has not been changed by subsequent events. The House of Representatives did not consider the various amendments to subsequent legislation to which the majority refers. That the Senate may have added amendments at different times that were deleted or that were accepted by the House conferees only in part does not mean that both Houses of Congress considered the respondent's interpretation and intended to approve it. At best, it can be said that the law was left in its existing state, with any ambiguities

---

[4]See Partnership for Health Amendments of 1967, Pub. L. 90–174, 81 Stat. 533, 42 U.S.C. sec. 246; Social Security Amendments Act of 1967, Pub. L. 90–248, 81 Stat. 821, 42 U.S.C. sec. 302; the Revenue and Expenditure Control Act of 1968, Pub. L. 90–364, 82 Stat. 251, 26 U.S.C. sec. 51; Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520.

to be resolved by the courts, and to perform this task we should examine the Revenue Act of 1950.

Second, the impetus for exempting hospital-affiliated organizations undoubtedly came from the hospitals themselves, in an attempt to avoid the uncertainty of litigation arising under the 1950 amendments. That these organizations were unsuccessful in their attempts to have the law amended to specifically include them and obviate the necessity of extensive litigation does not mean that Congress intended to approve of respondent's interpretation of the law. Applying the reenactment doctrine in this context means that whenever someone unsuccessfully attempts to have the law clarified or amended, the existing law will be read to require the opposite result from that provided by the proposed amendment, even though only one House of Congress considered the amendment. There seems no basis in logic or experience for such a principle of statutory construction, and it would have a disruptive impact on the legislative process.

Third, as Judge Tannenwald points out in his dissenting opinion, Congress has been aware throughout its legislative consideration of the earlier decision in the Court of Claims (*Hospital Bureau of Standards & Supplies, Inc. v. United States*, 141 Ct. Cl. 91 (1958)) which construed respondent's regulation as not precluding exemption of a hospital-affiliated organization providing hospital services.

Finally, I do not believe that regulation section 1.502–1(b) precludes exemption of petitioner. That regulation recognizes that a subsidiary performing activities that are an integral part of the exempt activities of the parent will be entitled to exemption. It is clear under the regulations and the examples that a large hospital can service its laundry through a subsidiary. In the case of a large hospital, its size may permit the laundry to operate at a point of maximum efficiency, providing an indispensable service at the lowest possible cost. However, in the case of four small hospitals, it is economically efficient for them to have their own laundry only if they combine their operation. When they do so, their situation is both economically and in terms of its impact on competition, indistinguishable from one large hospital doing the same thing. The four small hospitals may have the same total number of beds as the large hospital, thereby requiring the same magnitude of laundry services. Given their size, it may be more imperative that they cooperate

in this manner to hold down costs than it would be for the larger hospital.

It may be true, as the example in the regulations states, that if the subsidiary laundry organization was conducted by only one of the four hospitals, it would be an unrelated business activity. However, it is not "carried on by any one of the tax-exempt organizations," but is carried on by all of them as equal owners of the subsidiary that provides services that the majority notes are otherwise not available commercially. To the extent that the respondent has not simply misinterpreted his own example in the regulations, I believe the example creates an invidious distinction that cannot survive analysis, and I would invalidate that portion of the regulations. See *United Telecommunications, Inc. v. Commissioner*, 65 T.C. 278 (1975), supplemental opinion 67 T.C. 760 (1977), affd. 589 F.2d 1383 (10th Cir. 1978), cert. denied 442 U.S. 917 (1979).

FEATHERSTON, TANNENWALD, and HALL, *JJ.*, agree with this dissenting opinion.